STATE of Tennessee, Appellee,

v.

Ronnie M. CAUTHERN, Appellant.

Supreme Court of Tennessee, at Nashville.

Sept. 25, 1989.

Charles W. Burson, Atty. Gen. & Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, for appellee.

Hugh Poland, Jr., Clarksville, for appellant.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case. Defendant Ronnie M. Cauthern and a co-defendant Brett Patterson were indicted for felony murder of Patrick Smith and his wife Rosemary Smith during the perpetration of first degree burglary, and aggravated rape of Mrs. Smith. The jury found both defendants guilty of the two murders, first degree burglary and aggravated rape. At the guilt phase the jury sentenced Patterson to life imprisonment and Cauthern received the death penalty. Patterson's appeal is pending in the Court of Criminal Appeals. This case is the direct appeal of Ronnie Cauthern.

The Smiths were both captains in the U.S. Army stationed at Fort Campbell Kentucky. They lived in a split-level home in Clarksville, Tennessee, that they had purchased shortly after assignment to the nearby base. Both were nurses. When neither of them reported to their duty stations on the morning of 9 January 1987 and telephone calls to their home received no answer, two persons from the base went to their home, observed broken glass in the rear door, and both cars in the garage. A 911 call was made and the police arrived promptly and discovered the body of Patrick Smith lying face down on the bed in the master bedroom, facing 90 degrees counter clockwise from his sleeping position, and wrapped in the top sheet. He had been strangled to death, apparently with a length of 880 military cord. The bed was broken and tilted indicating a violent struggle had taken place. His wife's nude body was found on the floor. A scarf was tied around her neck and a small vase had been inserted into the scarf. She died of strangulation, the vase was obviously used to twist the scarf and reduce the circumference. Both had massive hematoma of the neck area. Mrs. Smith's nightgown and buttons torn from it were found in the room. Semen was apparent on the gown and a comforter from the bed. Sperm was found in the vaginal vault. Tests revealed the presence of PGM Type 1 secretions. The forensic serologist testified that the PGM Type 1 from the swab "was consistent with Cauthern, as well as Rosemary Smith."

The police found the telephone line had been cut near its entry into the outside wall of the house. A shoe print was found on the back door that matched Patterson's shoe. In a statement that he gave police he admitted kicking the back door once or twice, but said it would not open so they obtained a hammer and broke the pane of glass nearest the door knob to gain entry. The house was ransacked, chest of drawers open, luggage and clothing scattered about. In the master bedroom, the police found a piece of paper upon which was written defendant Cauthern's name, address and telephone number. Rosemary Smith's sister testified she was familiar with both her sister's and her brother-in-law's handwriting and the information about Cauthern was not written by either of them. The cumulative evidence in this record establishes that defendant and the Smiths had been acquainted for approximately a year at the time of the murders, that he had performed some work on Patrick's Mercedes and perhaps some additional work at their home, although he said in one of his statements that he had never been inside their home until the evening of 8 January 1987.

As far as this record shows the investigation of these murders did not focus on Cauthern and Patterson until James Phillip Andrew telephoned the Clarksville Police and asked to speak to an officer he had seen on T.V. news in a segment reporting on the double murder. That call was made at about 11:00 a.m. Monday morning 12 January 1987. A meeting with Andrew was arranged and as a result of the information he gave police, defendant and Patterson were arrested that afternoon.

Andrew was in the U.S. Army stationed at Fort Campbell. He was living in a trailer located in a mobile home park in Oak Grove, Kentucky, which he shared with Joe Denning and another man. Joe Denning was acquainted with defendant and Patterson and Andrew became acquainted with them through Denning. Andrew testified that defendant and Patterson came to the trailer to see Denning about 3:00 or 4:00 a.m. on Friday morning, 9 January, that after being awakened by their arrival he went back to sleep and neither heard nor saw anything relevant to the Smith murders. Andrew went to work at the base as usual that day and saw defendant again that night at the trailer and later at Rockvegas. It was not until Saturday afternoon at the trailer when they started to get "high" smoking marijuana that defendant began telling Andrew about his role in the Smith murders. Andrew did not believe him until defendant went to his car trunk and brought a box into the trailer containing credit cards, identification cards in the names of Patrick and Rosemary Smith, clothing and other items of personal property taken from their home.

Defendant gave several statements to the police, one of which was recorded on tape, transcribed and introduced at trial. Although he admitted participating in a robbery of the Smith premises, he denied that he "planned" anything or raped or murdered anyone. He claimed that he had had sexual relations with Mrs. Smith twice before and that she invited him to come to the Smith house and knock on the back door that Thursday evening. His statement to the police contained numerous contradictions and discrepancies. The "statement" he gave Andrew on Saturday afternoon while high on marijuana more closely coincided with proven events than any version that appears in this record. We quote from that part of Andrew's testimony, as follows:

A He said that him and Patterson went to the Smith's house—see, I didn't know the names then.

Q Was the name at that time not in the murder report in the paper?

A They weren't in the newspaper, there were no names and he said how they broke into the house, they kicked the door and they broke the window in the door, they opened the door, went in and they said they were sleeping and they woke up and Mr. Smith—you know, kept saying—what do you want and he said—Ronnie said that Patterson had jumped Mr. Smith and Ronnie had told Mrs. Smith to get in the closet. While he was doing that, they were trying to strangle—said they was trying to strangle Mr. Smith and Ronnie took Mrs. Smith in another room and said he had raped her then and went back in to help Patterson with Mr. Smith, and they said they couldn't get him down and they had to use a strap or belt, I don't know, to strangle him, and when they got him down, they both went in and then they raped her and then Ronnie killed Mrs. Smith—

Q Ronnie killed who?

A Mrs. Smith.

Q Did he tell you how he killed Mrs. Smith?

A Yes.

Q Tell the ladies and gentlemen of the jury what he told you as to how he did that?

A Okay, he first tried to strangle her, he couldn't do it, and then he grabbed the scarf, wrapped it around her neck and put a vase in it like a tourniquet and turned it until she strangled.

Q Did he talk to you about the sexual—

A Yes.

Q What did he tell you about that?

A He says—that she wasn't putting up a fight, she enjoyed it.

Q He told you that she was enjoying it?

A She enjoyed it, yes.

Q Anything else he said about the rape?

A Not about the rape, no—after that, do you want me to keep going?

Q Just tell the ladies and gentlemen—you just tell them what he told you, everything he told you about this incident over at the Smith house.

A And he said they started going through the house, that they were piling up things they were going to take in one pile and they took the VCR and there was a cord on the TV, they put this cord behind the TV and put books on the TV so it would look like they didn't have one.

Q What no, I didn't understand that, I am sorry.

A They said there was a VCR on the TV, and a plug in the back of the VCR, they threw the cord behind the TV and put books on it to look like there was no VCR on top of the TV.

Q They were gathering up other stuff—did he say why they would do that?

A They planned on taking everything they had piled up.

Q Oh, okay.

A And then they changed their minds, they took the VCR, their wallets—

Q Did he say—was anything mentioned about any jewelry?

A Yes.

Q What was that?

A He showed us a band.

Q He showed you what?

A The wedding band of Mr. Smith's.

Q Mr. or Mrs.?

A Mr. Smith's. He said he give the ring to his girlfriend.

Q But he showed you a wedding band?

A He showed me a wedding band.

Q A man's wedding band?

A I only got a glimpse of it 'cause he want out to the car and got all the stuff to prove it that he did it.

In addition Andrews testified that he asked defendant why he killed the Smiths and his response was they only had $70 and that made him mad. He said he had worked around the house, they were doctors and "always had money." Andrew was asked if defendant indicated to him he was having "some kind of an affair" with Mrs. Smith. His response was that defendant always told them "who he was messing around with" and he never said anything about "messing around with her."

Patterson gave a statement to TBI agent Breedlove and an investigator for the Clarksville Police Department. He said they were "originally supposed to be hitting some place owned by a guy by the name of Charles Hand." Defendant told him that Hand would have "like $15,000" in the trunk of his car, at night, and all they had to do was "pop the trunk and be gone." The car was not at Hand's house, so defendant told Patterson he knew another place where nobody would be home and they could pick up a couple of thousand. Defendant said he had worked for them and knew no one would be home. They drove up behind the house, got a hammer, screwdriver and other stuff out of the trunk of defendant's car and went to the back door. He tried to kick the back door open but defendant had to break the glass panel to get it open. He said they both had on leather gloves and ski masks. He checked out the downstairs with a flashlight "just looking stuff over, seeing what was there." When he went upstairs defendant was "wrestling with this guy on the bed." He thought defendant had already put the woman in the closet of the other bedroom. He said he was armed with a .45 caliber automatic and defendant had a .38 caliber. He said all he could think about was that this guy's going to get the better of defendant and he jumped in, turned him over face down and "put him in a sleeper, put him out." Smith was supposed to be out three to five minutes, but it didn't last that long, so he got a pillow case and tried to put it around his neck but it wasn't work-

ing and defendant handed him some twine, that was 880 military cord and he "used it like a garrote. All I wanted was to put him out so we could get the (expletive) out of there." He said he went in the other room, defendant said "it's your turn" and he had sex with the woman. In the meantime defendant had stacked up a lot of stuff, a couple of bags, a purse, VCR; they loaded it up and got out of there. He said that when he left the bedroom, the woman was alive and there was no gag or anything around her neck. He was asked if defendant said, "what he did with her." Patterson responded, "He said he strangled her."

When defendant and Patterson were arrested Monday afternoon, they were working on defendant's car at a duplex where they lived. Search warrants were obtained and from the car and the house numerous credit cards, identification cards, receipts, checks and other items of personal property belonging to the Smith's were found. Also, a roll of 880 military cord was found.

Defendant's girl friend testified that defendant and Patterson accompanied her to Arby's on Thursday night 8 June 1987 at about 9:30 p.m. She had a sandwich but they did not eat. Their eyes were dilated, and they weren't saying much. They were "laid back." She was sure they were not drinking because she could not smell anything, and she was a part-time bartender. She expressed the opinion they were on acid. She said defendant had told her several days before that, that he had ten hits of acid and on Wednesday night he told her he had been doing acid with Pat and Joe. She was on her way to report to work at 10:00 p.m. at Rockvegas, a bar and rock and roll joint. Defendant rode in her car from Arby's to Rockvegas and they smoked a marijuana cigarette on the way. Patterson left Arby's driving defendant's Camaro Z-28.

She also testified that on Friday 9 January defendant called her about noon, picked her up at her home about 1:00 p.m. and they rode around in the rain. He gave her a watch, a wedding band and a wedding ring to "hold on to for him for a while."

She saw him again on Sunday. He was jolly, in a good mood and told her again that he was planning to leave for Chicago—he had told her a week or more before the Smith murders that he was going to Chicago. He was always nice, courteous and pleasant with her, except for one occasion, and she had no basis whatever to suspect him of complicity in the Smith murders until her sister called her on Monday or Tuesday and told what she had heard on T.V. She tuned in the 10:00 p.m. news and heard the report that defendant had been arrested. She talked to her parents and went to the police station the next morning, gave them the wedding rings, watch and a stereo that defendant had installed in her car before the murder.

The first issue defendant raises on this appeal is that the trial judge erred in failing to suppress all of the statements defendant made to police because they were obtained by coercion.

Defendant made two oral statements on 12 January, the day he was arrested and gave a taped interview on Tuesday, 13 January 1987. The officers to whom the statements were given were Charles Denton and Joe Griffy. Defendant's counsel contends that defendant had worked for those officers for about one year prior to the murders, as an informer and an undercover man; that defendant trusted them, that a friendship existed between defendant and the two officers and that, "this very young naive defendant was coerced and persuaded by Denton and Griffy into giving the only really damaging confession."

At the suppression hearing, pre-trial, Officers Denton and Griffy testified, defendant did not testify. The first oral statement was made shortly after he was brought to the police station from the place of arrest. He was given complete *Miranda* warnings and signed a waiver. He denied any knowledge of the Smith murders or burglary.

The so-called second oral statement was made to Griffy, who had taken defendant from Denton's office to the booking room for processing, fingerprinting, photographing, etc. Griffy testified that while that

was going on defendant began telling him about some things about the Smiths. He told him that he had known them for some time, had worked on the Smith's car and was having an affair with Mrs. Smith; that she called him during the day of the murders and told him to come by that night; that he and Patterson went to the house, knocked on the door for 15 or 20 minutes and couldn't get in; that Patterson said, "let's break in", and tried to kick the door down but couldn't so defendant broke the glass, reached in and unlocked the door. Griffy gave no explanation for defendant stopping at that point, but that was the extent of the second statement, given about 4:00 p.m. on 12 January.

Earl Mullins, a jailer, testified that he was calling the roll at the jail around 3:00 p.m. on 13 January and as he passed Cauthern's cell, Cauthern asked him to contact Officer Griffy or Denton and tell them he wanted to talk to them. Mullins delivered that message and the officers came to the jail about 4:00 p.m., again gave defendant full *Miranda* warnings and he signed a waiver of rights. Just before the warnings were read to defendant he said:

CAUTHERN: But, I', I'll tell you how it is. If I'm going to have to spend five years, I'd rather just die. O.K.?

And, later:

CAUTHERN: It is to me, I mean, I'm going to go crazy up there. I'm going crazy up there now.

The *Miranda* warnings were read and the last two sentences in the warnings were as follows:

... If you decide to answer any questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand your rights?

Defendant then said that his lawyer had told him that he wasn't supposed to "say nothing unless he was here. Does that mean that I can't." Denton responded that it was up to him, that he could waive his right to an attorney and talk to him. Den-

ton then read aloud the contents of the waiver as follows:

DENTON: It says here, I have read the statement of my rights and I understand what my rights are. I am willing to make statements and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. And if you want to talk to us without your lawyer, you need to sign this right here on these lines.

He signed the waiver and the taped interview proceeded. On page 22 of the transcript of that interview, he expressed his first reservations about talking to the officers, as follows:

DENTON: Are you guilty?

CAUTHERN: Of murder, no.

DENTON: What are you guilty of?

CAUTHERN: Not rape and murder and taking anything.

DENTON: After telling me things, would you like to tell me again, just exactly this time, just exactly what happened?

CAUTHERN: No.

DENTON: Why?

CAUTHERN: Cause I know what I'm facing. (attempted to turn off machine)

DENTON: It's got to stay on.

CAUTHERN: No. Chuck.

DENTON: Do you know of anything else that was taken out of the house?

CAUTHERN: A man's wedding band was taken and pawned in a pawn shop.

DENTON: Do you know which one?

CAUTHERN: No.

DENTON: How much money did you get for it?

CAUTHERN: Twenty dollars.

The interview continued with Denton asking about items of personal property taken, most all of which had been found by the police, in the defendant's car and the residence of defendant and Patterson. Defendant was asked what time they left the house, where they went and who saw them and defendant answered. Then defendant

cut off the tape recorder that he was aware the officers were using. However, they had a hidden tape recorder that picked up the following:

DENTON: Don't cut it off.

CAUTHERN: And I know it's over and I know I can't change it and that's it. It was my fault.

DENTON: We can't cut this off, they'll throw everything out.

CAUTHERN: They can throw it all out.

DENTON: It's got to stay on.

CAUTHERN: No, Chuck.

DENTON: Go ahead.

CAUTHERN: I mean, I couldn't stop it, there were no way for me to.

DENTON, Ronnie, you planned this thing.

CAUTHERN: No, I didn't.

DENTON: You went to this house?

CAUTHERN: I didn't plan it, Chuck, I did not plan it. I knocked on the door for her to come downstairs.

DENTON: Ronnie, you sit here and lie to me again. You've said that you didn't take the stuff out, the watch and the ring were brought back to the office today by the young lady you gave it to.

CAUTHERN: I didn't take it. There's a wedding band from him too, somewhere. In a pawn shop.

DENTON: Which pawn shop?

CAUTHERN: I don't know. The ring was pawned for twenty dollars.

DENTON: Do you know of anything else that was taken out of the house?

CAUTHERN: A man's wedding band was taken and pawned at a pawn shop.

DENTON: Do you know which one?

CAUTHERN: No.

DENTON: How much money did you get for it?

CAUTHERN: Twenty Dollars.

CAUTHERN: Chuck, this ain't right.

DENTON: I know it's not right, Ronnie. I know it's not right. I can tell by looking in your beady little eyes you're not telling the truth and we're wasting our time.

DENTON: What are you doing that for?

CAUTHERN: Rewinding it.

DENTON: Through?

CAUTHERN: Yeah.

DENTON: I need to put on there what time we terminated, let me handle this, O.K.

CAUTHERN: I say we destroy it.

DENTON: No we're not going to destroy it.

CAUTHERN: Why?

DENTON: Quit.

CAUTHERN: Come on, Chuck.

DENTON: Quit, Ronnie.

GRIFFY: You through talking Ronnie?

CAUTHERN: Yes. (inaudible)

DENTON: Investigation interview terminated 4:53, January 13. Ronnie Cauthern has been taken back to his cell. Joe Griffy and Charles Denton terminating the interview.

■ During the cross-examination of Officer Griff, defense counsel established that defendant had "worked with" Griffy and Denton, "turning up certain things" for a period of "at least six months" preceding the Smith murders; that it was "easy for defendant to talk to "you"; and that both officers knew, before the third statement was given that counsel had been appointed to represent defendant and had advised defendant not to talk to anyone unless counsel was present. That was the extent of the evidence of the "friendship" between defendant and the two officers upon which defendant bases his claim of "coercion and persuasion" to the extent that defendant's statements were not freely and voluntarily given. Without some expression from defendant about what the prior relationship meant to him and to what extent it motivated his actions with respect to the statements made, we find that the prior relationship had no significant effect upon the voluntariness of either of the statements at issue.

Defendant cites *U.S. v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) and *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) in support of his insistence that the third statement should be suppressed. Neither case has any application to the facts in this record.

In *Henry* defendant made statements to an informer the government had planted in his cell, unknown to defendant. Obviously there was no voluntary waiver of rights, as in the case at bar. In *Brewer*, the police initiated the interrogation, contrary to an express agreement with defendant's counsel, did not give warnings nor obtain a waiver.

The trial judge expressly found that defendant "voluntarily initiated" the interview that resulted in the third statement, given on the afternoon of 13 January 1987, and after reading *Henry* and *Brewer*, cited to him by defendant's counsel at the hearing, denied the motion to suppress. We find that defendant initiated the interview, was given full *Miranda* warnings and freely, knowingly and voluntarily executed a written waiver of his right to remain silent and his right to counsel. The U.S. Supreme Court has clearly sanctioned the admissibility as a statement given after the appointment of counsel and even after defendant has "expressed his desire to deal with police only through counsel", where defendant initiates further communication, electing "to face the state's officers and go it alone," and knowingly and intelligently waives his Sixth Amendment right to counsel. *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ The real problem with the admissibility of the entire third statement arises with defendant's efforts to rescind his waiver of the Fifth Amendment right to remain silent.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the Court held:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

86 S.Ct. at 1627, 1628

Defendant sought to terminate the interrogation at page 22 of the transcript of his statement when after saying he was not guilty of rape, murder or taking anything, Officer Denton said, will you tell us again "just exactly what happened?" and he responded "No" and attempted to turn off the tape recorder. The officers should have terminated the interview at that time.

Defense counsel did not focus on that aspect of the statement in the trial court or in this Court, but we are compelled to find that the admission of the contents of the statement, as and after defendant's first attempt to turn off the tape recorder was plain error, in violation of the teachings of *Miranda*.

■ That holding requires that we determine whether the error was harmless or reversible pursuant to the harmless error test in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See* *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). We can say without hesitation that the contents of the statement that should have been excluded from the jury's consideration, although constitutional in scope, did not contribute to the verdict that defendant was guilty of murder in the first degree, and was harmless beyond a reasonable doubt on that issue. However, the determination of its effect on the verdict of death as punishment presents a more difficult issue.

As defendant attempted to turn off the machine, he said he knew what he was facing. It is obvious that he had reference to the electric chair. He had said at the beginning of the statement, as a reason for his willingness to talk to them without his lawyers, that he would rather die than spend five years in prison. Having revealed damaging facts that unmistakably implicated him in burglary, rape and murder he faced the prospect of death, changed

his mind and wanted to stop. Later, he succeeded in turning off the machine and tried to erase the tape and asked the officers to destroy it.

Defendant's statement that he knew what he was facing plus his later statement that: "... I know it's over and I know I can't change it and that's it. It was my fault." followed by, "I mean, I couldn't stop it, there was no way for me to." could have been one of the factors, if not the leading factor in the jury's verdict of death in defendant's case and life imprisonment in *Patterson*'s case.[1] For that reason we cannot find the admission of that part of the statement harmless with respect to the verdict of death, and a remand for a resentencing hearing will be necessary.

■ In the next issue raised by defendant, he makes an elaborate argument premised upon the theory that "malice" was used as an element to obtain a conviction of murder in the first degree, and that "malice" is synonymous with "heinous", "atrocious" and "depravity", which was used as an aggravating circumstance in the sentencing phase to obtain the death penalty. Defendant says that double use of malice violates the Eighth Amendment to the U.S. Constitution. Defendant is mistaken, factually and legally. Defendant was indicted and convicted of felony murder. Malice is not an element of felony murder. There is no Eighth Amendment prohibition against using an element in the conviction of first degree murder and using the same element in an aggravating circumstance to support the death penalty. *See Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). This issue has no merit.

Next, defendant says the trial judge abused his discretion in "refusing to allow individual voir dire regarding pretrial publicity," and, "to allow defense counsel to question jurors regarding their feelings about the death penalty", other than to ask questions based on the standards set forth in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Defendant failed to cite any particular ruling, by reference to any volume or page of the record, by a juror's name, or otherwise. Our review of the record to respond to this generalized complaint reveals no factual basis whatever for either complaint. The trial judge *did* permit individual and sequestered voir dire of jurors who indicated in general questioning that they had been exposed to pretrial publicity. With respect to questioning about the death penalty, we find that there were several instances where defendant's counsel asked wholly improper questions and the trial judge properly so ruled. There is no merit to this issue.

Defendant contends that the death penalty statute is unconstitutional because if any one of the aggravating circumstances is proven the statute shifts the burden to defendant to prove mitigating circumstances that outweigh the aggravating circumstance; and he says the statute does not "meaningfully limit the class of death eligible defendants." We have considered and rejected similar constitutional attacks on the statute, most recently in *State v. Thompson,* 768 S.W.2d 239 (Tenn.1989). There is no merit to this issue.

■ Finally, defendant asserts that the death penalty is a cruel and unusual punishment. He relies upon the dissenting opinion in *State v. Dicks,* 615 S.W.2d 126 (Tenn.1981). We continue to adhere to the majority opinion in that case.

We find that no prejudicial error was committed bearing upon the verdict of murder in the first degree, and that the evidence is such that any rational trier of fact could find guilt beyond a reasonable doubt in conformity with *Jackson v. Virginia,*

---

1. There was sufficient evidence of other factors in support of the jury's verdict to give Cauthern the death penalty and Patterson life imprisonment that would enable this Court to find that the sentence of death was not imposed on Cauthern in any arbitrary fashion, or was excessive or disproportionate to the penalty imposed in similar cases. However, that circumstance does not alter the fact that the inadmissible portion of defendant's 13 January statement cannot be said to have had no effect on the verdict of death and that it was harmless beyond a reasonable doubt.

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and T.R.A.P. 13(e). The verdict imposing the death penalty is set aside for the reason given and the case is remanded to the trial court for a resentencing hearing.

DROWOTA, C.J., and COOPER, HARBISON and O'BRIEN, JJ., concur.