FILED

03/24/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2016 Session

**RONALD CAUTHERN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Gibson County**
**No. 13762     Don R. Ash, Senior Judge**

_____

**No. W2015-01905-CCA-R3-ECN**

_____

Ronald Cauthern ("the Petitioner") filed a petition for writ of error coram nobis in the Gibson County Circuit Court, alleging that he was entitled to a new trial based on newly discovered evidence. The coram nobis court summarily denied the petition after concluding that the petition was untimely. The Petitioner now appeals the denial of coram nobis relief. Upon review, we affirm the coram nobis court's determination that the Petitioner's claim regarding an unedited videotape is time-barred. However, we reverse the judgment of the coram nobis court as to the Petitioner's claim regarding lab bench notes and remand for the coram nobis court to determine whether the Petitioner is entitled to due process tolling on this claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Ronnie M. Cauthern.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; John W. Carney, District Attorney General; and Arthur F. Bieber and Robert J. Nash, Assistant District Attorneys General, for the appellee, State of Tennessee.

Stephen Ross Johnson, Knoxville, Tennessee; and Dimitrios T. Drivas, Brendan G. Woodard, and Jayashree Mitra, New York, New York, for amicus curiae, The Federal Republic of Germany.

OPINION

## I. Factual and Procedural Background

In 1988, the Petitioner and co-defendant Brett Patterson were convicted by a Montgomery County jury of first degree burglary, aggravated rape, and two counts of felony murder for their involvement in a 1987 home invasion that occurred in Clarksville. State v. Cauthern, 778 S.W.2d 39, 40 (Tenn. 1989). Following the penalty phase of the trial, the jury sentenced co-defendant Patterson to life imprisonment, and the Petitioner received the death penalty for both murders. Id. The Tennessee Supreme Court provided the following facts on the Petitioner's initial direct appeal:

> The Smiths were both captains in the U.S. Army stationed at Fort Campbell Kentucky. They lived in a split-level home in Clarksville, Tennessee, that they had purchased shortly after assignment to the nearby base. Both were nurses. When neither of them reported to their duty stations on the morning of 9 January 1987 and telephone calls to their home received no answer, two persons from the base went to their home, observed broken glass in the rear door, and both cars in the garage. A 911 call was made and the police arrived promptly and discovered the body of Patrick Smith lying face down on the bed in the master bedroom, facing 90 degrees counter clockwise from his sleeping position, and wrapped in the top sheet. He had been strangled to death, apparently with a length of 880 military cord. The bed was broken and tilted indicating a violent struggle had taken place. His wife's nude body was found on the floor. A scarf was tied around her neck and a small vase had been inserted into the scarf. She died of strangulation, the vase was obviously used to twist the scarf and reduce the circumference. Both had massive hematoma of the neck area. Mrs. Smith's nightgown and buttons torn from it were found in the room. Semen was apparent on the gown and a comforter from the bed. Sperm was found in the vaginal vault. Tests revealed the presence of PGM Type 1 secretions. The forensic serologist testified that the PGM Type 1 from the swab "was consistent with [the Petitioner], as well as Rosemary Smith."
>
> The police found the telephone line had been cut near its entry into the outside wall of the house. A shoe print was found on the back door that matched [co-defendant] Patterson's shoe. In a statement that [co-defendant Patterson] gave police he admitted kicking the back door once or twice, but said it would not open so [the Petitioner and co-defendant Patterson] obtained a hammer and broke the pane of glass nearest the door knob to gain entry. The house was ransacked, chest of drawers open, luggage and

clothing scattered about. In the master bedroom, the police found a piece of paper upon which was written [the Petitioner's] name, address and telephone number. Rosemary Smith's sister testified she was familiar with both her sister's and her brother-in-law's handwriting and the information about [the Petitioner] was not written by either of them. The cumulative evidence in this record establishes that [the Petitioner] and the Smiths had been acquainted for approximately a year at the time of the murders, that he had performed some work on Patrick's Mercedes and perhaps some additional work at their home, although [the Petitioner] said in one of his statements that he had never been inside their home until the evening of 8 January 1987.

As far as this record shows[,] the investigation of these murders did not focus on [the Petitioner] and [co-defendant] Patterson until James Phillip Andrew telephoned the Clarksville Police and asked to speak to an officer he had seen on T.V. news in a segment reporting on the double murder. That call was made at about 11:00 a.m. Monday morning 12 January 1987. A meeting with Andrew was arranged and as a result of the information he gave police, [the Petitioner] and [co-defendant] Patterson were arrested that afternoon.

Andrew was in the U.S. Army stationed at Fort Campbell. He was living in a trailer located in a mobile home park in Oak Grove, Kentucky, which he shared with Joe Denning and another man. Joe Denning was acquainted with [the Petitioner] and [co-defendant] Patterson and Andrew became acquainted with them through Denning. Andrew testified that [the Petitioner] and [co-defendant] Patterson came to the trailer to see Denning about 3:00 or 4:00 a.m. on Friday morning, 9 January, that after being awakened by their arrival he went back to sleep and neither heard nor saw anything relevant to the Smith murders. Andrew went to work at the base as usual that day and saw [the Petitioner] again that night at the trailer and later at Rockvegas. It was not until Saturday afternoon at the trailer when they started to get "high" smoking marijuana that [the Petitioner] began telling Andrew about his role in the Smith murders. Andrew did not believe him until [the Petitioner] went to his car trunk and brought a box into the trailer containing credit cards, identification cards in the names of Patrick and Rosemary Smith, clothing and other items of personal property taken from their home.

[The Petitioner] gave several statements to the police, one of which was recorded on tape, transcribed and introduced at trial. Although he admitted

- 3 -

participating in a robbery of the Smith premises, he denied that he "planned" anything or raped or murdered anyone. He claimed that he had had sexual relations with Mrs. Smith twice before and that she invited him to come to the Smith house and knock on the back door that Thursday evening. His statement to the police contained numerous contradictions and discrepancies. The "statement" he gave Andrew on Saturday afternoon while high on marijuana more closely coincided with proven events than any version that appears in this record. We quote from that part of Andrew's testimony, as follows:

> A[:] He said that him and [co-defendant] Patterson went to the Smith's house—see, I didn't know the names then.
>
> Q[:] Was the name at that time not in the murder report in the paper?
>
> A[:] They weren't in the newspaper, there were no names and he said how they broke into the house, they kicked the door and they broke the window in the door, they opened the door, went in and they said they were sleeping and they woke up and Mr. Smith—you know, kept saying—what do you want and he said—[the Petitioner] said that [co-defendant] Patterson had jumped Mr. Smith and [the Petitioner] had told Mrs. Smith to get in the closet. While he was doing that, they were trying to strangle—said they was trying to strangle Mr. Smith and [the Petitioner] took Mrs. Smith in another room and said he had raped her then and went back in to help [co-defendant] Patterson with Mr. Smith, and they said they couldn't get him down and they had to use a strap or belt, I don't know, to strangle him, and when they got him down, they both went in and then they raped her and then [the Petitioner] killed Mrs. Smith—
>
> Q[:] [The Petitioner] killed who?
>
> A[:] Mrs. Smith.
>
> Q[:] Did he tell you how he killed Mrs. Smith?
>
> A[:] Yes.

- 4 -

Q[:] Tell the ladies and gentlemen of the jury what he told you as to how he did that?

A[:] Okay, he first tried to strangle her, he couldn't do it, and then he grabbed the scarf, wrapped it around her neck and put a vase in it like a tourniquet and turned it until she strangled.

Q[:] Did he talk to you about the sexual—

A[:] Yes.

Q[:] What did he tell you about that?

A[:] He says—that she wasn't putting up a fight, she enjoyed it.

Q[:] He told you that she was enjoying it?

A[:] She enjoyed it, yes.

Q[:] Anything else he said about the rape?

A[:] Not about the rape, no—after that, do you want me to keep going?

Q[:] Just tell the ladies and gentlemen—you just tell them what he told you, everything he told you about this incident over at the Smith house.

A[:] And he said they started going through the house, that they were piling up things they were going to take in one pile and they took the VCR and there was a cord on the TV, they put this cord behind the TV and put books on the TV so it would look like they didn't have one.

Q[:] What no, I didn't understand that, I am sorry.

A[:] They said there was a VCR on the TV, and a plug in the back of the VCR, they threw the cord behind the TV and put books on it to look like there was no VCR on top of the TV.

Q[:] They were gathering up other stuff—did he say why they would do that?

A[:] They planned on taking everything they had piled up.

Q[:] Oh, okay.

A[:] And then they changed their minds, they took the VCR, their wallets—

Q[:] Did he say—was anything mentioned about any jewelry?

A[:] Yes.

Q[:] What was that?

A[:] He showed us a band.

Q[:] He showed you what?

A[:] The wedding band of Mr. Smith's.

Q[:] Mr. or Mrs.?

A[:] Mr. Smith's. He said he give the ring to his girlfriend.

Q[:] But he showed you a wedding band?

A[:] He showed me a wedding band.

Q[:] A man's wedding band?

A[:] I only got a glimpse of it 'cause he w[e]nt out to the car and got all the stuff to prove it that he did it.

In addition Andrew[] testified that he asked [the Petitioner] why he killed the Smiths and his response was they only had $70 and that made him mad. He said he had worked around the house, they were doctors and "always had money." Andrew was asked if [the Petitioner] indicated to him he was having "some kind of an affair" with Mrs. Smith. His response was that

[the Petitioner] always told them "who he was messing around with" and he never said anything about "messing around with her."

[Co-defendant] Patterson gave a statement to TBI agent Breedlove and an investigator for the Clarksville Police Department. He said they were "originally supposed to be hitting some place owned by a guy by the name of Charles Hand." [The Petitioner] told him that Hand would have "like $15,000" in the trunk of his car, at night, and all they had to do was "pop the trunk and be gone." The car was not at Hand's house, so [the Petitioner] told [co-defendant] Patterson he knew another place where nobody would be home and they could pick up a couple of thousand. [The Petitioner] said he had worked for them and knew no one would be home. They drove up behind the house, got a hammer, screwdriver and other stuff out of the trunk of [the Petitioner's] car and went to the back door. [Co-defendant Patterson] tried to kick the back door open but [the Petitioner] had to break the glass panel to get it open. He said they both had on leather gloves and ski masks. He checked out the downstairs with a flashlight "just looking stuff over, seeing what was there." When [co-defendant Patterson] went upstairs [the Petitioner] was "wrestling with this guy on the bed." He thought [the Petitioner] had already put the woman in the closet of the other bedroom. [Co-defendant Patterson] said he was armed with a .45 caliber automatic and [the Petitioner] had a .38 caliber. He said all he could think about was that this guy's going to get the better of [the Petitioner] and [co-defendant Patterson] jumped in, turned him over face down and "put him in a sleeper, put him out." Smith was supposed to be out three to five minutes, but it didn't last that long, so he got a pillow case and tried to put it around his neck but it wasn't working and [the Petitioner] handed him some twine, that was 880 military cord and he "used it like a garrote. All I wanted was to put him out so we could get the (expletive) out of there." [Co-defendant Patterson] said he went in the other room, [the Petitioner] said "it's your turn" and he had sex with the woman. In the meantime [the Petitioner] had stacked up a lot of stuff, a couple of bags, a purse, VCR; they loaded it up and got out of there. He said that when he left the bedroom, the woman was alive and there was no gag or anything around her neck. [Co-defendant Patterson] was asked if [the Petitioner] said, "what he did with her." Patterson responded, "He said he strangled her."

When [the Petitioner] and Patterson were arrested Monday afternoon, they were working on [the Petitioner's] car at a duplex where they lived. Search warrants were obtained and from the car and the house numerous credit cards, identification cards, receipts, checks and other items of personal

property belonging to the Smiths were found. Also, a roll of 880 military cord was found.

[The Petitioner's] girlfriend testified that [the Petitioner] and Patterson accompanied her to Arby's on Thursday night 8 June 1987 at about 9:30 p.m. She had a sandwich but they did not eat. Their eyes were dilated, and they weren't saying much. They were "laid back." She was sure they were not drinking because she could not smell anything, and she was a part-time bartender. She expressed the opinion they were on acid. She said [the Petitioner] had told her several days before that . . . he had ten hits of acid and on Wednesday night he told her he had been doing acid with Pat and Joe. She was on her way to report to work at 10:00 p.m. at Rockvegas, a bar and rock and roll joint. [The Petitioner] rode in her car from Arby's to Rockvegas and they smoked a marijuana cigarette on the way. [Co-defendant] Patterson left Arby's driving [the Petitioner's] Camaro Z-28.

She also testified that on Friday 9 January [the Petitioner] called her about noon, picked her up at her home about 1:00 p.m. and they rode around in the rain. He gave her a watch, a wedding band and a wedding ring to "hold on to for him for a while." She saw him again on Sunday. He was jolly, in a good mood and told her again that he was planning to leave for Chicago—he had told her a week or more before the Smith murders that he was going to Chicago. He was always nice, courteous and pleasant with her, except for one occasion, and she had no basis whatever to suspect him of complicity in the Smith murders until her sister called her on Monday or Tuesday and told what she had heard on T.V. She tuned in the 10:00 p.m. news and heard the report that [the Petitioner] had been arrested. She talked to her parents and went to the police station the next morning, gave them the wedding rings, watch and a stereo that [the Petitioner] had installed in her car before the murder.

Id. at 40-43. The Supreme Court affirmed the Petitioner's convictions, but it set aside the death sentence and remanded the case for a new sentencing hearing. State v. Cauthern, 778 S.W.2d 39 (Tenn. 1989).

On remand, the trial court granted the Petitioner's motion to transfer the case out of Montgomery County due to pretrial publicity, and a new sentencing hearing was held in Gibson County. State v. Cauthern, 967 S.W.2d 726, 729 (Tenn. 1998). Following a sentencing hearing before a jury in Gibson County, the Petitioner received a life sentence for the murder of Mr. Smith and the death penalty for the murder of Mrs. Smith. Id. This court and the Tennessee Supreme Court affirmed the judgments of the trial court on

- 8 -

appeal. Id. at 730; State v. Ronnie Michael Cauthern, No. 02C01-9506-CC-00164, 1996 WL 937660, at *1 (Tenn. Crim. App. Dec. 2, 1996).

In 1999, the Petitioner filed for post-conviction relief in the Montgomery County Circuit Court, which denied relief following an evidentiary hearing. Cauthern v. State, 145 S.W.3d 571, 579 (Tenn. Crim. App. 2004). This court affirmed, and the Tennessee Supreme Court denied discretionary review. Id. at 571, 578, 633.

In 2005, the Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Tennessee. Cauthern v. Colson, 736 F.3d 465, 472 (6th Cir. 2013). The district court denied the petition; however, on November 14, 2013, the United States Court of Appeals for the Sixth Circuit reversed as to two claims[1] and granted a conditional writ of habeas corpus. Id. at 468, 489. The court ordered the State to "commence resentencing proceedings for [the] Petitioner within 180 days or vacate his sentence of death." Id. at 489.

The Petitioner's case was returned to the Gibson County Circuit Court where proceedings were timely commenced and the State filed a new notice of intent to seek the death penalty. On April 17, 2015, the Petitioner filed a petition for writ of error coram nobis, which is the subject of this appeal. The Petitioner alleged that in April 2014 the parties had requested that certain VHS videotapes be converted to digital format and that the digital conversion occurred on April 17, 2014.[2] According to the Petitioner, the conversion process revealed that an edited tape had been introduced as an exhibit at trial and that the unedited tape contained thirteen minutes of footage that the State had failed to turn over to the defense. Specifically, the Petitioner alleged that the unedited tapes showed that officers searched the Petitioner's vehicle before a warrant was issued, "likely planted evidence on the [Petitioner], and were not truthful in their affidavit seeking a search warrant describing the property in the vehicle."

The Petitioner further alleged that, after the discovery of this new evidence, he and his counsel could not agree on the best manner to proceed with the new evidence, and

---

[1] Specifically, the Sixth Circuit ruled that the Tennessee Supreme Court's determination that prosecutorial misconduct during closing argument at the resentencing hearing did not affect the jury's verdict was an unreasonable application of clearly established federal law. Cauthern, 736 F.3d at 474-78. Additionally, the Sixth Circuit found that this court unreasonably applied clearly established federal law when it determined that trial counsel at the Petitioner's resentencing did not render ineffective assistance of counsel by failing to present the testimony of the Petitioner's step-siblings. Id. at 483-87.

[2] The petition states that the digital conversion of the videotapes occurred "on or around April 17, 2015." However, it is clear from the record that this was a typographical error and that the digital conversion took place in April 2014.

- 9 -

they informed the coram nobis court of this conflict. The coram nobis court appointed new counsel on January 5, 2015, and within one month, new counsel received forty-six boxes of discovery from the Petitioner's prior counsel.[3] The Petitioner asserted that "[a]dditional discovery revealed the recent disclosure of blood lab bench notes that [had] never been previously disclosed." According to the Petitioner, the lab bench notes contained newly discovered evidence of cross-contamination and improper handling of the blood specimens used by the State as part of its case-in-chief in the guilt phase of the Petitioner's trial.

The Petitioner asserted a violation of Brady v. Maryland, 373 U.S. 83 (1963), based on this new evidence. He alleged that the State failed to turn over in discovery a copy of the unedited videotape showing the search and seizure of his car. According to the petition, the unedited videotape showed:

> Two credit cards in particular appear the first time in the trunk of [the] Petitioner's car, then after a cut in the continuity of filming, the same two cards are again "discovered" and recovered from [the] Petitioner's jacket. This newly discovered evidence of police misconduct led to [the] Petitioner reevaluating the discovery which led to the discovery of the credit cards in this case moving from one recovery site to another and being checked in and out of evidence logs at different times prior to being discovered in [the] Petitioner's "possession."

The video further showed, according to the Petitioner, that checks found in the trunk of his car belong to "some unrelated third party," rather than to the victims as stated in the police report. The Petitioner noted that this allegation was "supported by the newly discovered tow-in ticket provided recently for the first time."

The Petitioner maintained that the unedited videotape showed that the evidence was seized prior to the issuance of a search warrant because "police checked out the credit cards in question from the evidence room before the police then 'found' the credit cards in the open trunk of [the Petitioner's] car (and in his jacket)." Additionally, the Petitioner stated that the unedited videotape showed that officers falsely stated in the application for a search warrant that they found incriminating evidence in plain sight. He claimed that the State's failure to provide the unedited videotape prevented him from properly attacking the search and seizure of his person and property.

---

[3] In his brief, the Petitioner states that the "process of discovering what is contained in the [forty-six] boxes remains ongoing."

- 10 -

Regarding the lab bench notes, the Petitioner alleged that "the State, for the first time, provided [the] Petitioner's attorneys a copy of the handwritten TBI forensics report, containing the raw data of blood testing and the receipt of evidence at the lab." The Petitioner further alleged that the collected blood standards from the victims and the Petitioner were packaged together "in violation of standard lab protocol" and that "[a]t least one sample appearing to be the blood of Captain Rosemary Smith broke during transport and contaminated all other samples."

In addressing the timeliness of the coram nobis petition, the Petitioner stated:

It is not in dispute that the petition for writ of error coram nobis in the case herein was filed within the applicable statute of limitations as the case is still pending trial court review and has not become final by the exhaustion of post-judgment litigation. However, petitions [for] coram nobis need not be filed within the on[e]-year statute of limitations when due process requires tolling.

The State filed a response to the coram nobis petition, asserting a statute of limitations defense and noting that no affidavits were filed in support of the petition. The State further alleged that "[a]ll videos produced by the [S]tate in discovery came from tapes introduced at trial or during motions . . . and [the] [P]etitioner knew of them."

The coram nobis court scheduled a status conference for August 12, 2015. At the status conference, the Petitioner argued that he was entitled to a hearing on whether newly discovered evidence necessitated a retrial of the guilt phase of his trial. Although the State responded that the petition was not timely filed, the Petitioner asserted that "the issue of timeliness was also a factual matter that required evidence to be presented to determine if due process should toll the statute [of limitations] based on discovery of the claim in April of 2014."[4] The parties did not present testimony or introduce exhibits at this time. Instead, after hearing from counsel for the Petitioner and the State, the coram nobis court found that the allegations in the petition did not warrant a full hearing and denied relief in a written order.

In denying the petition, the coram nobis court found:

It is not at all clear to this court the evidence at issue is in fact "newly discovered" evidence. The evidence in question was located in the

_____

[4] The record on appeal does not contain a transcript of the status conference due to the State's failure to secure a court reporter for the hearing, as requested by the coram nobis court. However, the Petitioner filed a statement of the evidence, as contemplated by Rule 24(c) of the Tennessee Rules of Appellate Procedure, to which the State did not file any objections.

Montgomery County Circuit Court Clerk's case file and was admitted as an exhibit to [the] [P]etitioner's trial. Counsel for [the] [P]etitioner acknowledge they are unable to state the evidence was not provided to [the] [P]etitioner's trial counsel. Rather, given the version of the tape presented to the jury was apparently specifically redacted to exclude references to other cases pending against [the] [P]etitioner, it appears [the] [P]etitioner's original trial counsel likely viewed the VHS tapes in their entirety and upon becoming aware of the superfluous and prejudicial information requested they be redacted for the jury. Thus, the statements of defense counsel, the statements of the prosecution and the record in this case support the conclusion this evidence was likely provided to original defense counsel. However, even accepting [the] [P]etitioner's assertion his trial counsel was never provided the tapes in pretrial discovery, [the] [P]etitioner has still failed to meet his burden of establishing the exercise of reasonable diligence would not have led to a timely discovery of the new information.

The evidence at issue was marked [as] an exhibit at [the] [P]etitioner's 19[8]8 trial and became part of the Clerk's file. Thus, the tapes were available to 1996 resentencing counsel, subsequent post[-] conviction counsel and finally federal habeas counsel. Thus, under the Vasques holding and the due process principles enunciated in Burford, this court finds [the] [P]etitioner is not without fault in failing to timely present such claims. The [P]etitioner has had over twenty years to review the evidence contained in the Montgomery County Circuit Court Clerk[']s[] file. The exercise of reasonable diligence on the part of any number of attorneys handling [the] [P]etitioner's case over the years would have resulted in the discovery of the evidence at issue. Therefore, [the] [P]etitioner is not entitled to a tolling of the statute of limitations and his claims are now procedurally barred by the application of the one[-]year statute of limitations.

This timely appeal followed.

## II. Analysis

On appeal, the Petitioner asserts that the coram nobis court erred by summarily denying his petition based on the applicable statute of limitations. The Petitioner contends that the petition for writ of error coram nobis was filed "within the applicable statute of limitations as the case is still pending trial court review and has not become final by the exhaustion of post-judgment litigation." Alternatively, the Petitioner contends that due process requires the tolling of the one-year statute of limitations.

A writ of error coram nobis is an "*extraordinary* procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (emphasis in original) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b) (2014).

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. See Harris v. State, 102 S.W.3d 587, 592 (Tenn. 2003). "Coram nobis claims may be based upon any 'newly discovered evidence relating to matters litigated at the trial' so long as the petitioner establishes that the petitioner was 'without fault' in failing to present the evidence at the proper time." Id. at 592-93. A defendant may raise a Brady violation relative to newly discovered exculpatory evidence possessed by the State at the time of a trial but never disclosed to the defendant in a coram nobis petition. Terry Lynn King v. State, No. E2014-01202-CCA-R3-ECN, 2015 WL 3409486, at *7 (Tenn. Crim. App. May 28, 2015) (citing Freshwater v. State, 160 S.W.3d 548, 555-56 (Tenn. Crim. App. 2004)), perm. app. denied (Tenn. Sept. 16, 2015). Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. Harris, 102 S.W.3d at 593.

"[I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity. If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result." State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007) (emphasis in original). In determining whether the new information may have led to a different result, the question before the court is "'whether a

reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceedings might have been different.'" Id. (quoting State v. Roberto Vasques et al, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. Oct. 7, 2005)). The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. Id. at 527-28.

*Statute of Limitations*

Petitions for writ of error coram nobis are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103 (2014); Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris, 301 S.W.3d at 144 (citing Mixon, 983 S.W.2d at 670). Calculating the statute of limitations in this manner is consistent with the "longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." Mixon, 983 S.W.2d at 670; Harris, 301 S.W.3d at 144. The State bears the burden of raising the statute of limitations as an affirmative defense. Harris, 301 S.W.3d at 144. Whether a claim is time-barred is a question of law, which we review de novo. Id. (citing Brown v. Erachem Comilog, Inc., 231 S.W.3d 918, 921 (Tenn. 2007)).

It appears from the record that the Petitioner was convicted in February 1988 and sentenced in March 1988. It is not clear whether the Petitioner filed a timely post-trial motion; however, he filed a notice of appeal in May 1988. Thus, the Petitioner's judgments of conviction became final in the trial court sometime between March and May of 1988. Because the Petitioner had one year from the date the judgments became final to file a petition for writ of error coram nobis, the petition should have been filed by May of 1989, at the latest. See Harris, 301 S.W.3d at 144. However, the petition for writ of error coram nobis was not filed until April 17, 2015, over twenty-five years beyond the statute of limitations.

The Petitioner contends, at least with respect to his conviction for the murder of Mrs. Smith, that the petition was timely filed because he is "without a final sentence" for that conviction until he is resentenced following the federal court's grant of a conditional writ of habeas corpus.[5] This court has addressed previously a similar argument in Erskine Leroy Johnson v. State, No. W2007-01546-CCA-R3-CO, 2009 WL 3126237, at *6 (Tenn. Crim. App. Sept. 30, 2009), no perm. app. filed. In that case, the defendant was convicted in 1985 of first degree felony murder and sentenced to death. Id. at *1.

---

[5] At oral argument, the State announced that, following the filing of the parties' briefs, the State withdrew the previously filed death notice in this case.

- 14 -

The defendant's conviction and sentence were affirmed on direct appeal.  Id. at *2.  However, following the trial court's denial of post-conviction relief, this court affirmed the defendant's conviction but remanded the case for a new capital sentencing hearing.  Id.  Our supreme court affirmed this court's ruling in 2001.  See Johnson v. State, 38 S.W.3d 52, 63 (Tenn. 2001).  On remand, the State did not seek the death penalty, and the trial court sentenced the defendant to life in prison on November 15, 2004.  Erskine Leroy Johnson, 2009 WL 3126237, at *2, 6.  On April 22, 2005, the defendant filed a petition for writ of error coram nobis.  Id. at *2.  At a hearing, the State argued that the coram nobis court should dismiss the petition because the defendant filed it well-outside the one-year statute of limitations.  Id. at *6.  However, the coram nobis court subsequently dismissed the petition on the basis that the defendant was at fault for timely failing to discover the evidence.  Id. at *1.

On appeal, the State argued that the petition should have been dismissed as untimely based upon the one-year statute of limitations.  Id. at *5.  The defendant responded that the petition was timely filed in April 2005 because the judgment of conviction did not become final until he was resentenced to life on November 15, 2004.  Id. at *6.  In rejecting the defendant's argument, this court stated:

> [I]f we were to agree with the [defendant] that the judgment did not become final until December 15, 2004, thirty days after the [defendant] was resentenced, then it would suggest the judgment remained unfinalized in the trial court for approximately twenty years.  Obviously, that is not the case.  Furthermore, to conclude that the judgment did not become final until after resentencing would be "inconsistent with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim" and "would unnecessarily compromise society's interest in finality" to criminal judgments.

Id. (quoting Harris, 102 S.W.3d at 670-71); see also Mixon, 983 S.W.2d at 671 ("Extending the time for filing a petition for writ of error coram nobis until one year after appellate proceedings have concluded would unnecessarily compromise society's interest in finality.").

We agree with the sound reasoning in Erskine Leroy Johnson and conclude that the Petitioner's judgment of conviction for the murder of Mrs. Smith became "final," for the purpose of computing the one-year statute of limitations, sometime between March and May of 1988.  His petition, filed on April 17, 2015, is grossly untimely.

*Due Process Tolling*

In certain circumstances, due process considerations may require tolling the statute of limitations. Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001). To determine whether due process requires tolling, we must balance the State's interest in preventing "stale and groundless" claims against the petitioner's interest in having a hearing to present newly discovered evidence which may have led the jury to a different verdict if it had been presented at trial. Id. at 103. To balance these interests, courts should use a three-step analysis:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the ground for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995); see also Harris, 301 S.W.3d at 145.

## Unedited Videotape

Regarding the unedited videotape, the Petitioner asserts that he is entitled to due process tolling because the prosecutor falsely stated during a pretrial hearing that the videotape of the search of the Petitioner's vehicle "started out with [the officer] showing the search warrant on the video" and that this misstatement caused his twenty-five-year delay in discovering the unedited videotape and its contents. He further asserts that it was only when the unedited videotape was digitized that the name of "Rick E. Newman" could be read on a check found in the Petitioner's trunk because the videotape was "not of a high enough resolution quality to reveal the false information provided [by] the police." Under the three-step analysis from Sands, the limitations period in this case normally would have commenced when the Petitioner's judgments of conviction became final in the trial court—sometime between March and May of 1988. This ground for relief, however, was not "later arising." As noted by the coram nobis court, the unedited videotape was marked as an exhibit at the Petitioner's 1988 trial and became part of the Montgomery County Circuit Court Clerk's file.[6] The videotape was thus available for review by trial counsel, the Petitioner's 1996 resentencing counsel, subsequent post-conviction counsel, and his federal habeas counsel, and the exercise of reasonable diligence by the Petitioner would have resulted in the discovery of the evidence at issue.

---

[6] The Petitioner does not dispute that the unedited videotape was made part of the trial record as an exhibit and that the exhibit was located in the Montgomery County Circuit Court Clerk's file.

Because the ground for relief is not "later arising," the Petitioner is not entitled to due process tolling on the claim.

## Lab Bench Notes

Turning to the lab bench notes, the Petitioner contends that "it is likely that the evidence was only disclosed [by the State] in 2014 after a change in circumstances concerning the medical examiner in this case." The Petitioner asserts that because the coram nobis court did not conduct a hearing he was "prohibited from submitting an offer of proof," but he has attached to his brief a copy of the lab bench notes "to show what evidence would have been submitted to the [] coram nobis court had the court granted a hearing."

In its order, the coram nobis court did not address the lab bench notes when it denied the petition based on the statute of limitations. Thus, no court has considered whether the Petitioner is entitled to due process tolling based upon his claim that the State withheld lab bench notes that show the possibility of tainted blood evidence. Once again, under Sands, the limitations period in this case normally would have commenced when the Petitioner's judgments of conviction became final in the trial court—sometime between March and May of 1988. Based upon the record before the court, it is unclear (1) when the Petitioner's counsel obtained the lab bench notes; (2) whether the State withheld the evidence; and (3) whether the purported failure of the State to turn over the lab bench notes prior to trial would have amounted to a Brady violation. As such, we are unable to determine whether this ground for relief actually arose after the limitations period commenced, and we must reverse the judgment of the coram nobis court as to this claim and remand for a hearing to determine whether the Petitioner is entitled to due process tolling.

## Tow-In Ticket

Finally, the Petitioner contends that he is entitled to coram nobis relief based on a tow-in ticket that he claims was withheld by the State in violation of Brady and not discovered by the Petitioner's counsel until October 17, 2014. The Petitioner asserts that the ticket shows that a tow truck was called to the location of the Petitioner's vehicle at 12:15 p.m., which the Petitioner alleges "contradict[s] sworn police testimony," and he has attached a copy of a tow-in ticket to his appellate brief. However, the petition for writ of error coram nobis filed by the Petitioner contained only a passing reference to the tow-in ticket; it did not allege the tow-in ticket as a separate ground for relief, and the Petitioner failed to attach affidavits to the petition in relation to the tow-in ticket. Consequently, the tow-in ticket was not addressed by the coram nobis court. Moreover, the Petitioner fails to make a specific argument as to the tow-in ticket on appeal, and

instead focuses on the unedited videotape and lab bench notes. For these reasons, we conclude that the Petitioner has waived any claim relating to the tow-in ticket. <u>See</u> <u>Cauthern</u>, 145 S.W.3d at 599 ("[A]n issue raised for the first time on appeal is waived." (citing <u>State v. Alvarado</u>, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996))); Tenn. Ct. Crim. App. Rule 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

### III. Conclusion

For the aforementioned reasons, the judgment of the coram nobis court is affirmed as to its determination that the claim regarding the unedited videotape is time-barred. However, the judgment of the coram nobis court is reversed as to the claim regarding the lab bench notes, and the case is remanded for a hearing on whether due process requires tolling the statute of limitations as to this claim.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 18 -