IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 25, 2020 Session

## STATE OF TENNESSEE v. ANTONIO TOOMES

**Appeal from the Circuit Court for Crockett County**
**No. 4413     Clayburn Peeples, Judge**

_____

**No. W2019-00360-CCA-R3-CD**

_____

The Defendant, Antonio Toomes, appeals his convictions for felony murder and especially aggravated burglary, for which he received an effective sentence of life imprisonment plus thirty years. On appeal, the Defendant contends: (1) the trial court erred in ordering him to proceed pro se at trial on the day before trial; (2) the trial court erred in denying his motion to suppress his statements to law enforcement; and (3) the prosecutors made improper comments during voir dire and closing arguments. We conclude that the trial court erred in finding that the Defendant implicitly waived or forfeited his right to counsel and in requiring the Defendant to proceed pro se at trial. Accordingly, we reverse the judgments of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed; Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Michael R. Working and Janet H. Goode, Memphis, Tennessee (on appeal); and Antonio Toomes, pro se (at trial), for the appellant, Antonio Toomes.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Garry G. Brown, District Attorney General; and Hillary Lawler Parham, Jason Scott, and Jerald Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

On February 11, 2013, the Defendant was indicted for felony murder in the perpetration of or attempt to perpetrate aggravated burglary, especially aggravated robbery, and especially aggravated burglary as a result of his role in the death of Mr. Matthew McKnight during a home invasion in Crockett County, Tennessee, on October 18, 2012. Prior to trial, the State dismissed the especially aggravated robbery charge. The Defendant was appointed two different attorneys, both of whom were allowed to withdraw. On the day before trial, the trial court allowed the Defendant's third appointed attorney to withdraw, found that the Defendant had either implicitly waived or forfeited his right to counsel, and ordered the Defendant to proceed pro se at trial. The case proceeded to trial on February 2, 2016.

According to the evidence presented at trial, the victim lived with his parents, Mr. and Mrs. Don and Judy McKnight. When the victim failed to meet his father for lunch as planned, Mrs. McKnight went home to check on the victim and found him deceased on the living room floor from a single gunshot wound to his right leg. The bullet traveled through the victim's right knee, tore a major vessel, and exited through the back of his knee, causing the victim to bleed out.

French doors leading to the outside of the home were open, and the inside of the home was in disarray. The McKnights' television had been removed from the wall and was on the living room floor, and Mrs. McKnight's jewelry was scattered in the home. Various pieces of jewelry belonging to Mrs. McKnight and Mr. McKnight's .357 Magnum firearm were missing from the home. A palm print lifted from the side of one of the doors above the deadbolt matched the Defendant's left palm print. A fingerprint lifted from Mrs. McKnight's jewelry box matched the Defendant's left thumb print.

Multiple bullet defects were in the walls of the home. Officers collected multiple bullet fragments and a live round to a .380 automatic firearm from the home. Officers also collected a spent bullet from the living room, and it was determined to have been fired from Mr. McKnight's gun. Mr. McKnight's gun was later recovered by officers during a traffic stop in Lauderdale County, but officers were unable to connect the vehicle's occupants to the crimes.

While Special Agent Mark Reynolds of the Tennessee Bureau of Investigation ("TBI") was at the scene on the day of the homicide, he received a call from the Defendant, whom he knew prior to the offenses, and the Defendant asked whether anyone had mentioned his name in connection with "this incident that happened in Crockett County." At that point, the offenses had not been publicized to the media, and Special Agent Reynolds stated that the Defendant would only have known about the offenses if he was involved in their commission. Special Agent Reynolds met with the Defendant, who denied any involvement in the offenses.

On January 29, 2013, TBI Special Agent Cathy Ferguson and another agent interviewed the Defendant, who waived his rights and agreed to speak to them. He "adamantly" denied any involvement in the offenses, became "irate," and "ended the interview." On March 5, 2013, after the Defendant was indicted and while incarcerated and represented by counsel, he sent word to Special Agent Ferguson through Crockett County officers that he wanted to meet with her. Special Agent Ferguson and another agent met with the Defendant, who waived his rights and agreed to speak to them. During the recorded interview, the Defendant stated that he, Christopher Toomes, and Casey Wright planned to break into houses and that they chose the McKnights' home because it did not appear that anyone was at home. The victim arrived while they were still in the home, and Mr. Wright shot the victim with a firearm that the Defendant had taken from a bedroom. On March 12, 2013, Special Agent Ferguson met with the Defendant and his attorney, and the Defendant identified a photograph of the car in which he and the other two men drove to the McKnights' home. During the course of her investigation, Special Agent Ferguson spoke to Ms. Pamela Frazier, who did not provide an alibi for the Defendant. Special Agent Ferguson testified that the Defendant never provided her with the name of a potential alibi witness.

The jury convicted the Defendant of felony murder and especially aggravated burglary, and the trial court sentenced him to life imprisonment plus thirty years as a persistent offender. The trial court appointed counsel to file a motion for new trial on behalf of the Defendant, and the record reflects that multiple attorneys were appointed to represent the Defendant and were allowed to withdraw prior to the hearing on the motion for new trial. The Defendant filed a motion for a new trial and numerous amended motions both through counsel and pro se. Following a hearing during which the Defendant was represented by counsel, the trial court denied the Defendant's request for a new trial.

## ANALYSIS

On appeal, the Defendant contends that: (1) the trial court erred in ordering him to proceed pro se at trial on the day before trial; (2) the trial court erred in denying his motion to suppress his statements to law enforcement; and (3) the prosecutors made improper comments during voir dire and closing arguments.

### I. Right to Counsel

The Defendant asserts that the trial court deprived him of his Sixth Amendment right to counsel by ordering him to proceed pro se on the day before trial. He maintains that he neither implicitly waived nor forfeited his right to counsel. He also challenges the validity of the proceedings that led to the trial court's ruling, arguing that the State lacked

standing to file a motion requesting that the trial court require him to proceed pro se at trial and that it was improper to allow counsel who was representing him at the evidentiary hearing to testify against him at the same hearing. The Defendant maintains that because the trial court issued its ruling the day before trial, he did not have adequate time in which to locate and subpoena witnesses in support of his alibi defense. The State responds that the record establishes that the Defendant implicitly waived and forfeited his right to counsel.

## A. Factual and Procedural Background

Shortly after the Defendant was indicted in February of 2013, the trial court appointed the District Public Defender's Office to represent him, and Ms. Jamie Berkley, an Assistant District Public Defender, was assigned to the Defendant's case. Ms. Berkley filed motions requesting discovery, a preliminary hearing, and to compel discovery. According to the trial court's order, the Defendant's request for a preliminary hearing was denied following a hearing in June of 2013. The State filed responses to the discovery requests, as well as a notice of its intent to use evidence of the Defendant's prior convictions as impeachment if he testified at trial and a notice of its intent to seek enhanced punishment.

In February of 2014,[1] the Defendant filed a pro se motion requesting the trial court remove Ms. Berkley as counsel. He alleged that Ms. Berkley failed to provide him with various evidence, failed to allow him to undergo a mental health evaluation and a polygraph, failed to meet with him, failed to appeal the trial court's denial of the motion for a preliminary hearing, failed to allow him to speak to the media, failed to provide documentation evidencing the trial court's rulings on various motions, and failed to file numerous motions. The Defendant also wrote a letter to the trial court in which he made similar complaints and stated that he had filed a complaint with the Tennessee Board of Professional Responsibility ("TBPR"). The trial court denied the Defendant's motion, and he filed a pro se application in this court seeking to appeal the trial court's order, which this court denied. *See State v. Antonio Toomes*, No. W2014-00483-CCA-R10-CD (Tenn. Crim. App. Mar. 24, 2014) (order).

The Defendant then filed two pro se motions in the trial court, one requesting police reports and the other requesting the suppression of his statements to law enforcement. He alleged that prior to giving the statements, he was not advised of his rights and did not waive his rights, that the statements were obtained after the

---

[1] The file-stamp on the motion reflects that it was filed in 2013, but certificate of service, the trial court's order on the motion, and other pleadings in the appellate record reflect that the motion was filed in 2014.

commencement of formal criminal proceedings and after he requested counsel, and that the statements were coerced in that he was beaten and threatened. In April of 2014, Ms. Berkley filed a motion to withdraw as counsel, stating that the Defendant had refused to communicate with her since the trial court denied his motion to remove her as counsel, that the Defendant sought to appeal the trial court's order, that he filed two complaints with the TBPR against her, one of which was filed after the trial court's denial of his motion, and that he filed two pro se motions in the trial court. Prior to the hearing on the motion to withdraw, the Defendant filed two additional pro se motions, as well as a pro se motion to remove counsel and appoint new counsel in which he made allegations similar to those made in this initial motion to remove counsel. A transcript of the April 21, 2014 hearing is not included in the appellate record. However, the trial court entered an order in December 2014 referencing the hearing, granting Ms. Berkley's motion to withdraw, and appointing the law firm of Newman and Webb to represent the Defendant.

In August of 2014, Mr. James Webb, as counsel for the Defendant, filed a motion for additional discovery, a motion for funds to retain a fingerprint expert, and a motion requesting that the Defendant's recorded statements be transcribed by a court reporter. Mr. Webb also scheduled a hearing on the Defendant's previously filed pro se motion to suppress his statements to law enforcement. The suppression hearing was scheduled for October 27, 2014, but Mr. Webb filed a motion to continue a few days before the hearing because he had not yet received the transcripts of the Defendant's statements or medical records that the Defendant had asked him to obtain.

The appellate record includes twenty-four pro se motions filed by the Defendant on October 28, 2014, and during a hearing on November 25, 2014, Mr. Webb and the prosecutor estimated that the Defendant had filed between thirty and thirty-three pro se motions. The motions included various motions for discovery, to suppress, to dismiss, for the disclosure of grand jury minutes and proceedings, for a bill of particulars, for a jury instruction on the range of punishment, to restrict publicity, to compel an election of offenses, for a change of venue, for a preliminary hearing, and for access to public records. During the same time period, the Defendant sent letters to the trial court clerk and to the county mayor requesting what he maintained were public records.

During the November 25th hearing, Mr. Webb announced that his ability to represent the Defendant had been compromised by the Defendant's filings of the pro se motions. Mr. Webb stated that he had instructed the Defendant to send any motions to him for filing and that the Defendant had chosen to bypass him and file the motions pro se. When questioned by the trial court, the Defendant stated that he and Mr. Webb had a breakdown in communication and complained that he had not yet received some of the evidence in the case. The trial court told the Defendant that he needed to cooperate with Mr. Webb. The Defendant stated that he had tried to cooperate and that he wanted to

meet with Mr. Webb to review the original, rather than a copy, of the recordings of his statements and to compare them to the transcripts. The Defendant stated that he did not have any issues with Mr. Webb and was not seeking to have him removed as counsel. Mr. Webb informed the trial court that while he would rather not withdraw from the case, he and the Defendant "are going to have to cooperate as opposed to working against each other."

The prosecutor informed the trial court that the Defendant's case had been pending since February of 2013 and that Mr. Webb was the second attorney to represent the Defendant. Mr. Webb responded that while Ms. Berkley and the Defendant experienced "some difficulties," he believed Ms. Berkley ultimately withdrew because the Defendant alleged that his statements were involuntary, that Ms. Berkley was present for one of the Defendant's interviews with law enforcement, and that she believed she potentially could be a witness.

Mr. Webb informed the trial court that "[i]t would be easy for me to ask to get off the case, but … the next lawyer is going to have the same problem." The trial court informed the Defendant that all filings and communication must be made through Mr. Webb and that the trial court, the clerk's office, and the State would return any communication or pleadings sent to them by the Defendant. The trial court told the Defendant that Mr. Webb had an ethical obligation to refrain from filing any motions for which he believed had no legal basis. The trial court stated that it was not "fully denying" Mr. Webb's "semi-request" to withdraw and told Mr. Webb that "[i]f in the near future you come to a decision that it's simply inappropriate for you to represent him, I will grant your motion to get off this case. If this case weren't two years old, I'd do that now, but it is two years old." The trial court set the trial for August 11, 2015.

On March 23, 2015, the trial court entered an order referencing a hearing on March 16th and granting the Defendant's motion to remove counsel. The appellate record does not include the Defendant's motion or a transcript of the hearing. The trial court appointed Mr. J. Colin Morris to represent the Defendant. Mr. Morris represented the Defendant during hearings in August of 2015 and argued the Defendant's previously filed pro se motions on the Defendant's behalf. At the conclusion of the hearings, the trial court scheduled the trial for February 2, 2016, and stated that monthly status hearings would occur until trial.

On December 10, 2015, Mr. Morris filed a motion to withdraw as counsel, in which he stated that on November 15th, he received a voicemail through his cell phone messaging service during which the caller threatened his life if he did not withdraw from the case. Mr. Morris stated that "the threat contained language to the extent the Defendant knew the location of Counsel's residence." Mr. Morris noted that sometime

prior to the threat, the Defendant had asked the trial court to remove Mr. Morris as counsel. Mr. Morris maintained that the threat "created a communication barrier that [would] not allow him to represent the Defendant effectively."

During a hearing on January 11, 2016, the trial court questioned the Defendant about the threatening calls, and the Defendant denied any knowledge of the threats. The trial court instructed Mr. Morris to play the recordings of the messages. Mr. Morris played three recordings and stated that he received the first message on November 14, 2015, and that he received two additional messages on the same night approximately two weeks prior to the hearing. The recordings were entered as an exhibit at a subsequent hearing. The appellate record includes the recording of only one message. In the message, a man ordered Mr. Morris to withdraw as the Defendant's counsel and stated, "You are not his f***ing lawyer." The man stated that "we" knew details about Mr. Morris's life and that, "We even know you f***ing date of birth." The man said that he had been sitting outside Mr. Morris's home for the last four days and that he could have killed Mr. Morris or had him killed. The man stated, "It's bigger than you." He warned Mr. Morris that if he did not withdraw, "we ain't gonna call your phone no more or sit outside your f***ing house. We're coming in."

The Defendant again denied any knowledge of the threats. The trial court asked the Defendant whether he had any issues with Mr. Morris as his counsel, and the Defendant replied, "Yeah, I got a problem with him 'cause he ain't did nothing since he had the case, Your Honor. He ain't done nothing. I haven't talked to Mr. Morris since he had this case, period." The trial court informed the Defendant that his trial was scheduled for February 2nd and that either Mr. Morris was going to represent him or he would have to represent himself. The Defendant continued to insist that Mr. Morris was not his attorney, that Mr. Morris had not performed any work on his case, and that Mr. Morris had not met with him. When the trial court again advised the Defendant of the date of trial, the Defendant replied, "I'm cool with it, but Mr. Morris ain't my attorney, Your Honor." The Defendant complained about Mr. Morris's representation and stated, "If we got to go to trial we can go to trial, but Mr. Morris will not be in there with me, Your Honor."

The prosecutor raised a question regarding the Defendant's potential waiver of his right to counsel. The prosecutor advised the trial court that before finding the Defendant waived his right to counsel, the court must inform the Defendant that if his behavior continued, the court could determine that the Defendant waived his right to counsel. The prosecutor requested that the trial court advise the Defendant of the disadvantages of self-representation and noted that Mr. Morris was the third attorney appointed to represent the Defendant.

- 7 -

The trial court told the Defendant that he had "run off two separate lawyers," and the Defendant replied, "Do you know why, Your Honor? 'Cause ain't nobody doing their job but me. We haven't even seen—where is the evidence in this case?" When the trial court stated that the Defendant was "not going to run off the third one," the Defendant responded, "Well, he ain't my attorney, Your Honor." The Defendant also said, "If you want to go to trial we can go to trial."

The Defendant acknowledged that he was aware that he had a constitutional right to represent himself. The trial court explained to the Defendant, "You have a right not to allow any lawyer to represent you, but I have an obligation before I let you do that to explain to you that your conduct up to now have been such that no lawyer has been able to adequately represent you. Mr. Morris is doing [his?] best to do that." The trial court continued,

> You are perilously close to waiving or giving up your right to a lawyer. If you do that you're going to be at the mercy of your own mental devices, which means you're not going to have anybody to help you to tell you when to object, to tell you what's possible and what's not possible, and you're going to be at an extremely great disadvantage. You're not going to be able to legally analyze the proof. You're not going to be able to adequately cross examine witnesses who testify against you. You're going to be [at] a severe disadvantage when this case comes to trial.

The trial court told the Defendant that it was ordering Mr. Morris to continue to represent him and that on the day of trial,

> if you don't want him to represent you and you want to represent yourself, I'm going to let you do that, but I'm not going to continue the case. I'm not going to allow you to hire another lawyer to come in here even if you could, and I'm not going to appoint anybody else to represent you.

The Defendant responded, "I'm ready for trial. Let's get ready for trial." He continued,

> Let's get ready for trial. I'm ready to go. What's up? I'm through talking. Ain't nothing to talk about, Your Honor. I've been knowing what's been going on from day one. You know he ain't doing his job. If that's the case, if he was doing his job under my Sixth Amendment rights for effective assistance of counsel we would have inspected all the evidence that y'all say y'all got on me. We ain't seen nothing. It's been three years. I ain't seen nothing. Mr. Morris ain't seen nothing. Mr. Webb ain't seen nothing.

- 8 -

The trial court asked the Defendant whether he had any additional questions, and the Defendant replied, "No, I'm through talking. I'm though talking. I don't got nothing else to say. Let's get ready for trial."

The trial court ordered Mr. Morris to continue to represent the Defendant and to be prepared for trial. When Mr. Morris asked the trial court about the ongoing investigation into the threats, the trial court replied, "I understand it could develop that you've got a conflict. At this point, it has not." The prosecutor informed the trial court that if the court is going to find that the Defendant waived his right to counsel, the court must hold a hearing during which the Defendant has an opportunity to testify and that the court must make findings of fact. The trial court scheduled the hearing for February 1, 2016, the day before trial.

On Friday, January 29, 2016, the State filed a memorandum of law in which the State requested that the trial court find that the Defendant implicitly waived or forfeited his right to counsel. The State also requested that the trial proceed on February 2nd as scheduled. According to the certificate of service, the pleading was sent to Mr. Morris as the Defendant's counsel via facsimile on the day on which it was filed.

The trial court began the hearing on Monday, February 1st, with the following exchange with the Defendant:

> THE COURT: Mr. Toomes, as you know, we met on January the 11th in Humboldt to discuss your case. At that time, you indicated you did not desire that Mr. Morris represent you; that you would not allow him to represent you; that you would not cooperate with him. Am I correct about that?
>
> [THE DEFENDANT]: He ain't cooperating. He ain't never came and talked to me. I ain't never seen him since—since he had this case.
>
> THE COURT: Did you tell me you weren't going to work with him?
>
> [THE DEFENDANT]: No. I ain't—I'm not.
>
> THE COURT: Sir? You're not going to work with him?
>
> [THE DEFENDANT]: No. I'm not gonna work with him.

The trial court recited the history of the proceedings based upon its records. The court noted that Ms. Berkley was appointed to represent the Defendant on February 19, 2013, that the Defendant requested that Ms. Berkley be removed as counsel approximately one year later, and that the trial court denied the request. The court stated that on April 21, 2014, Ms. Berkley filed a motion to withdraw "after the Defendant had, among other things, filed multiple complaints against her with the Board of Professional Responsibility." The trial court appointed the law firm of Newman and Webb to represent the Defendant. The trial court stated that the Defendant was advised of the appointment in open court on May 15, 2014, and the trial was set for August 11, 2015. The trial court recalled that on March 16, 2015, Mr. Newman and Mr. Webb advised the court that the Defendant refused to cooperate with them, and the court allowed them to withdraw as counsel. The trial court stated that "at that point, the State brought up the possibility of the Defendant waiving his right to counsel; however, I didn't listen."

On April 7, 2015, the trial court appointed Mr. Morris to represent the Defendant. The trial court noted that it "pleaded" with the Defendant to cooperate with Mr. Morris and that the Defendant assured the court that he would do so. The trial court stated, "Since that time, the Defendant has refused to cooperate with Mr. Morris." The Defendant interjected, denying the trial court's statement. The court noted that Mr. Morris had received threats on his life, which led to the hearing on January 11, 2016. The prosecutor agreed that the trial court's summary was consistent with his records.

The prosecutor asked the trial court to find that the Defendant both waived and forfeited his right to counsel. The Defendant responded that he did not fire Mr. Morris but that Mr. Morris filed a motion to withdraw. The Defendant stated that the trial court told him that he had to go to trial with Mr. Morris as his attorney even though Mr. Morris never visited him in prison and had not consulted with him. The Defendant recalled that his last words at the January 11th hearing were, "Let's go to trial." He maintained that he "would not go in the courtroom tomorrow without Mr. Morris." The Defendant denied threatening Mr. Morris and stated that he did not understand the purpose of the hearing. The Defendant stated, "I'm not going to trial without [Mr. Morris] since that's what you're saying. The day I left he's my attorney. Okay. That's my attorney." The Defendant concluded, "I'm not forfeiting or waiving nothing."

The State called Ms. Berkley as a witness and questioned her regarding her representation of the Defendant. Ms. Berkley testified that she was appointed to represent the Defendant on February 19, 2013, and that she met with the Defendant at the Crockett County Jail within two weeks of her appointment. She recalled meeting with the Defendant on multiple occasions and reviewing the discovery with him. She recalled filing a motion requesting a preliminary hearing, which the trial court denied.

- 10 -

Ms. Berkley testified that in July of 2013, the Defendant filed a complaint against her with the TBPR, alleging that she had failed to file appropriate motions and failed to adequately communicate with him. She did not recall any motions that needed to be filed at that time. Ms. Berkley stated that while she continued to represent the Defendant after he filed the complaint, their relationship did not improve. The Defendant was transferred to the custody of the Tennessee Department of Correction after his probation was revoked in a case out of Lauderdale County. Ms. Berkley met with the Defendant at the prison on one occasion. She stated that the Defendant "was often hard to deal with at the beginning of … our discussions. He would become more compliant toward the end, but then, ultimately, would file a Motion or complaint soon thereafter." They exchanged several letters and discussed the evidence at length.

Ms. Berkley testified that on March 26, 2014, the Defendant filed a second complaint with the TBPR, alleging that she was present when the Defendant was forced to confess. She stated that she was "present when he made statements, but not under the conditions in which he described." As a result, Ms. Berkley filed a motion to withdraw, and she stated that the trial court granted the motion, finding that she had a conflict of interest because she could have been called as a witness during a suppression hearing. The Defendant did not contest Ms. Berkley's withdrawing as counsel, as he had previously filed motions asking that she be removed as counsel. Ms. Berkley testified that she believed that she was prepared to represent the Defendant and proceed with a trial and that she had discussed setting the case for trial with the Defendant.

At the conclusion of the State's questioning of Ms. Berkley on direct examination, the trial court stated, "Mr. Morris, at this point you're still representing Mr. Toomes. Do you have any questions for her?" Mr. Morris stated that he did not have any questions for Ms. Berkley. The trial court then asked the Defendant whether he had any questions for Ms. Berkley. The Defendant maintained that Ms. Berkley's testimony was untrue and stated, "I don't want to say nothing to her."

The State then called Mr. Webb as a witness regarding his representation of the Defendant. Mr. Webb testified that he went to the prison where the Defendant was housed and met with him on three occasions. Mr. Webb also met with the Defendant either before or after the status hearings. Mr. Webb stated that he reviewed the evidence at the prosecutor's office and traveled to the TBI's crime laboratory to review the physical evidence. Mr. Webb recalled that the Defendant complained that Mr. Webb had not reviewed the evidence when he had done so. Mr. Webb took a photograph of himself reviewing the physical evidence and showed it to the Defendant. However, the Defendant then began making other complaints about Mr. Webb's representation.

Mr. Webb agreed that at some point, the relationship between him and the Defendant deteriorated to the point that Mr. Webb believed he could no longer represent the Defendant. The Defendant filed a motion to remove Mr. Webb as counsel, alleging that Mr. Webb failed to communicate with him adequately and failed to file the motions that the Defendant wanted him to file. The Defendant also filed a complaint with the TBPR making the same allegations. Mr. Webb stated that he had numerous correspondence between him and the Defendant in his file that contradicted the Defendant's claims. In March of 2015, the trial court allowed the law firm of Newman and Webb to withdraw as the Defendant's counsel. Mr. Webb believed that he adequately reviewed the evidence and that he would have been prepared for trial.

After the prosecutor completed his direct examination of Mr. Webb, the trial court gave Mr. Morris the opportunity to cross-examine Mr. Webb, and Mr. Morris declined to ask any questions. The trial court then asked the Defendant whether he had any questions for Mr. Webb, and the Defendant stated that he did not. The prosecutor announced that he had intended to call Mr. Morris as a witness but that Mr. Morris was still "technically" representing the Defendant. The trial court allowed Mr. Morris to testify, stating, "Well, this being the Hearing to determine whether or not Mr. Morris is going to be representing him, I think it's appropriate for him to testify. I'm sure you won't ask him anything that he's not allowed to divulge."

In response to questioning by the prosecutor, Mr. Morris testified that he was appointed to represent the Defendant approximately one year prior to the hearing. He stated that he met with the Defendant for fifteen to thirty minutes in the jury room following his appointment. Mr. Morris obtained discovery from the State and materials from Mr. Newman. The trial court entered orders transporting the Defendant to the local jail so that Mr. Morris could meet with him. Mr. Morris missed the first meeting at the jail because the order had not yet been filed but was able to meet with the Defendant prior to a motion hearing. During the hearing, approximately thirty motions, including a motion to suppress, were addressed. Mr. Morris stated that the motions had been pending prior to his appointment. He stated that at that time, the Defendant was "a little edgy" but that they still had a productive attorney-client relationship. Mr. Morris recalled appearing before the trial court on multiple occasions and assuring the court that he would be ready for the trial scheduled for February 2, 2016.

Mr. Morris testified that on November 14, 2015, he received a call during which the caller stated something similar to, "This is a threat on your life. Do not represent Mr. Toomes. This is bigger than you. File your Motion." Mr. Morris stated that the caller indicated that the Defendant was going to hire counsel. After Mr. Morris received the threat but before he filed a motion to withdraw, a hearing occurred prior to the January 2016 hearing to discuss the threat. During the hearing, the trial court did not allow Mr.

Morris to withdraw as counsel. Mr. Morris testified that following the hearing, he attempted to speak to the Defendant as officers were escorting the Defendant out of the courthouse. Mr. Morris asked the Defendant if he planned to hire an attorney. Mr. Morris said the Defendant "kind of shook me off with his hands" and replied, "No. I don't need to speak to you. Get away from me." After officers led the Defendant to the elevator and as the doors were closing, the Defendant told Mr. Morris, "You need to file your motion."

Mr. Morris testified that on December 28, 2015, he received two more voicemails during which the caller threatened him if he continued to represent the Defendant. Mr. Morris stated that he took the threats seriously and called the police. He said police officers have been watching his home as a result of the threats.

Mr. Morris believed he filed a motion to withdraw prior to receiving the second set of threatening calls and that the threats were address in open court prior to the January 11, 2016 hearing. He stated that he did not have any conversations with the Defendant about preparing for the trial on January 11th. Mr. Morris recalled that when the trial court asked the Defendant who made the calls, the Defendant "deflected the question" and maintained that he did not know anything about Mr. Morris's personal life.

Mr. Morris testified that he did not want to represent the Defendant and that the Defendant told him in October that he did not want Mr. Morris representing him. Mr. Morris said, "I can be prepared [for trial], but I wouldn't—I don't—I'm adverse to him." Mr. Morris explained,

> My heart's not in it. No, sir. And, you know, I think he's entitled to the best [defense] he can have, and I think his frustrations are legitimate to a certain degree. He cooperated with the TBI. He actually gave the name of the … person who is the actual shooter in this case and that person hasn't been arrested, and I understand his frustrations, but I've got a line of demarcation. I've got to step in and say, look I've got to have a life and I can't live like that and I don't want him thinking that he's got me living in fear, but I'm watching myself and I don't know what else to do. If, in fact, they can [link] that case up to him, I want him prosecuted.

The trial court asked the Defendant if he wanted to question Mr. Morris, and the Defendant declined.

The State next presented the testimony of Investigator Daniel Long of the Jackson Police Department regarding his investigation into the threatening calls. Investigator Long testified that he was able to connect one of the calls made on November 14th to Mr.

- 13 -

Shaun Price, an inmate housed in the same prison as the Defendant. Investigator Long stated that he had not interviewed the Defendant or Mr. Price. At the conclusion of the direct examination, the trial court asked, "Questions?" The Defendant "indicated negatively."

Finally, the State presented the testimony of Mr. Christopher Bernard with the Tennessee Department of Correction's Office of Investigations and Compliance. He stated that in October of 2015, the Defendant and Mr. Price were in the same housing unit and that at one time, their cells were next to each other. Since December 22, they had lived on the same tier of the housing unit. Mr. Bernard had not yet spoke to Mr. Price regarding the calls. Mr. Bernard noted that Mr. Price was a confirmed member of the Gangster Disciples and that the Defendant was suspected to be a member of the Crip gang. At the conclusion of the direct examination, the trial court asked Mr. Morris whether he had any questions for Mr. Bernard, and Mr. Morris stated that he did not. The trial court then asked the Defendant whether he had any questions, and the Defendant questioned Mr. Bernard regarding his claim that the Defendant was a gang member.

At the conclusion of the proof, the Defendant stated that he did not wish to proceed with trial without counsel and that he had not had the opportunity to hire another attorney to represent him. He noted that during the January 11th hearing, the court told him that Mr. Morris was his attorney, that the Defendant replied, "Let's go to trial," and that he did not say that he wanted to go forward with the trial without Mr. Morris as his counsel. The Defendant stated that since the hearing, Mr. Morris had not spoken to him about the case. The Defendant concluded, "[Y]ou let it be known that day that Mr. Morris was my attorney, so that's my assumption, that Mr. Morris is still my attorney."

The trial court found that the Defendant had not waived his right to counsel "in the classic sense" but that the Defendant had implicitly waived his right to counsel. The court noted that it had advised the Defendant that he would lose his right to counsel if his misconduct and delay tactics continued and that the court had explained the risks of self-representation to him. The trial court found that during the period in which the case had been pending, the Defendant had "egregiously manipulated his constitutional right to counsel in order to delay and prevent the orderly administration of justice" and that the Defendant's "actions, especially including his actions with regard to threatening his current attorney, are extreme and egregious." The trial court found that the only possible explanation for the calls having been made from the same prison in which the Defendant was housed was that the Defendant "was complicit in their having been made." The trial court determined that it would be inappropriate to require Mr. Morris to remain on the case as elbow counsel and explained, "Attorneys aren't required to like their defendants. They may even loathe them, but they are not required to live under the threat of danger or death at the hands of their clients." The trial court ordered the Defendant to represent

himself at the trial that was to begin on the following day. The trial court later entered a written order, adopting its oral findings and concluding that the Defendant forfeited his right to counsel.

During a conference on the morning of the trial, the Defendant asked the trial court about defense witnesses and stated that his counsel was supposed to have issued subpoenas for multiple witnesses, including an alibi witness. The trial court clerk confirmed that no subpoenas had been issued on the Defendant's behalf, and the trial court informed the Defendant that he would not be able to call any witnesses who were not present. The prosecutor stated that the defense had not filed a notice of an alibi even though the State had filed a request.

Prior to voir dire, the trial court instructed the prospective jurors that the Defendant would be representing himself at trial and that they need not concern themselves with the reason for him doing so. During voir dire, the Defendant maintained his innocence and argued that the evidence of his guilt was lacking. He also stated that on the day before trial, "they fired my lawyer and wanted me to represent myself." The State did not make a contemporaneous objection. When the trial court asked the parties for their juror challenges, the prosecutor approached the bench and requested a curative instruction based on the Defendant's statement. Rather than informing the prospective jurors to disregard the Defendant's statements and to not concern themselves for the reason that the Defendant was representing himself at trial, the trial court gave the following instruction:

> Mr. Toomes told the jury that his attorney was fired yesterday. The record will show that his attorney was not fired yesterday. His attorney was allowed to withdraw from representation due to what he believed and the Court believed was Mr. Toomes' refusal to cooperate with him in preparing a defense in this case.

The State completed its proof on the first day of trial. The trial court informed the Defendant that if he was able to locate any witnesses, he could present them the next day. On the following day, the Defendant told the trial court that although he had statements from multiple witnesses, he did not have all of the witnesses' contact information. The Defendant did not present any proof and chose not to testify in his own defense. He was convicted of the charges at the conclusion of the trial.

## B. Analysis

The Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant a right to counsel. *See Gideon*

*v. Wainwright*, 372 U.S. 335, 339 (1963); *State v. Holmes*, 302 S.W.3d 831, 838 (Tenn. 2010). The right to counsel is a constitutional safeguard "'deemed necessary to insure fundamental human rights of life and liberty.'" *Holmes*, 302 S.W.3d at 838 (quoting *Johnson v. Zerbst*, 304 U.S. 45, 462 (1938)). The right to assistance of counsel "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000) (citations omitted). "The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant." *Id.* (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). However, the wrongful deprivation of the right to counsel is a structural error contaminating the proceedings to such a degree that reversal is mandated. *Holmes*, 302 S.W.3d at 838 (citations omitted).

Generally, the waiver of the right to counsel must be knowingly, intelligently, and voluntarily made. *Carruthers*, 35 S.W.3d at 546 (citing *Johnson*, 304 U.S. at 464-65; *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999)). The trial court must advise the defendant of the dangers and disadvantages of self-representation and must determine that the defendant "'knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). While recognizing that "'the right to counsel is not a license to abuse the dignity of the court or to frustrate orderly proceedings,'" the Tennessee Supreme Court has concluded that "'the right to counsel can be implicitly waived or forfeited if a defendant manipulates, abuses, or utilizes the right to delay or disrupt a trial.'" *Holmes*, 302 S.W.3d at 839-40 (quoting *Carruthers*, 35 S.W.3d at 546-47).

A trial court's finding following a hearing that a defendant forfeited his right to counsel at trial is a mixed question of law and fact. *Id.* at 837 (citing *Abdur' Rahman v. Bredesen*, 181 S.W.3d 292, 305 (Tenn. 2005)). This court reviews mixed questions of law and fact de novo with a presumption that the trial court's findings of fact are correct. *See id.*

In the present case, the trial court did not distinguish between the implicit waiver of the right to counsel and the forfeiture of the right to counsel and appeared to use the terms interchangeably. Implicit waiver and forfeiture, however, are two separate concepts. *See Holmes*, 302 S.W.3d at 840-41; *Carruthers*, 35 S.W.3d at 548-49 (noting the difference is "slight"). An implicit waiver is made when the defendant's misconduct continues after the trial court warns the defendant that the misconduct will result in the loss of the right to counsel. *Carruthers*, 35 S.W.3d at 548; *State v. James Richardson Reese*, No. M2011-01556-CCA-R3-CD, 2013 WL 1089097, at *18 (Tenn. Crim. App. Mar. 14, 2013). Forfeiture of the right to counsel may result "regardless of the defendant's intent to relinquish the right and irrespective of the defendant's knowledge of the right." *Carruthers*, 35 S.W.3d at 548.

## 1. Implicit Waiver

Essential to an implicit waiver is a warning of the impending consequences and an opportunity for the defendant to avoid the extreme sanction of the loss of the right to counsel. *Holmes*, 302 S.W.3d at 840. "[A]n implicit waiver is presumed from the defendant's conduct *after* he has been made aware that his continued misbehavior will result in the dangers and disadvantages of proceeding pro se." *Id.* The warnings need not be "extensive and detailed" and a general explanation of the risks of self-representation is sufficient. *Carruthers*, 35 S.W.3d at 549. Our supreme court and this court have concluded that a defendant did not implicitly waive his right to counsel when the trial court failed to warn the defendant that his continued misbehavior would result in the loss of the right to counsel. *See, e.g.*, *Holmes*, 302 S.W.3d at 841; *State v. Rashunus B. Pearsons*, No. M2017-01488-CCA-R3-CD, 2018 WL 4026758, at *9 (Tenn. Crim. App. Aug. 22, 2018); *James Richardson Reece*, 2013 WL 1089097, at *18.

The trial court warned the Defendant that his continued misbehavior would result in the loss of his right to counsel and advised the Defendant of the dangers and disadvantages of self-representation. The trial court provided the warnings during the January 11th hearing after two attorneys had been allowed to withdraw and a third attorney had received death threats. The record does not reflect that the Defendant continued to engage in misconduct between the January 11th hearing and the February 1st hearing such that he waived his right to counsel. The proof presented during the February hearing focused upon the Defendant's conduct prior to the January hearing when he received the warning from trial counsel, and the trial court did not identify any misbehavior by the Defendant following the January hearing in concluding that the Defendant must proceed pro se at trial. The trial court's findings particularly focused upon the threats to Mr. Morris, all of which were made prior to the January hearing. According, we hold that the trial court erred in finding that the Defendant implicitly waive his right to counsel.

## 2. Forfeiture

A defendant who engages in "extremely serious misconduct" may forfeit the right to counsel even without a warning regarding the potential for implicit waiver or an explanation of the pitfalls of self-representation. *Carruthers*, 35 S.W.3d at 548. Utilizing the right to counsel to manipulate, delay, or disrupt trial may result in forfeiture. *Id.* at 549. The Tennessee Supreme Court has recognized that "a criminal defendant's constitutional right to assistance of counsel is so fundamental, particularly at trial, that only the most egregious misbehavior will support a forfeiture of that right without warning and an opportunity to conform his or her conduct to an appropriate standard." *Holmes*, 302 S.W.3d at 846. The court cautioned that "'[f]orfeiture is an extreme

- 17 -

sanction in response to extreme conduct that imperils the integrity or safety of court proceedings,' that it should be utilized only under 'extraordinary circumstances,' and that it should be a 'last resort in response to the most grave and deliberate misconduct.'" *Id.* at 846-47 (quoting *Commonwealth v. Means*, 907 N.E.2d 646, 658, 659, 660 (Mass. 2009)).

In *Holmes*, the Tennessee Supreme Court held that the determination of whether a defendant's physical assault of his or her counsel constitutes "extremely serious misconduct" that warrants forfeiture of the right to counsel at trial depends upon the particular facts and circumstances of the assault. *Id.* at 847. The court held that under the facts of the case, the defendant's verbal threat and physical assault of his original counsel did not constitute "extremely serious misconduct" warranting forfeiture when the defendant's behavior occurred prior to trial such that the forfeiture affected his right to counsel at trial as opposed to a later proceeding; there was no indication that the defendant engaged in the conduct in order to delay, obstruct, or manipulate the proceedings; counsel was not injured; the assault was a single incident against the defendant's original counsel; and other means of protecting counsel's safety were available. *Id.* at 847-48.

However, "extremely serious misconduct" that rises to the level of forfeiture of the right to counsel is not limited to a defendant's physical assault of his or her counsel. *See id.* at 847 n. 10. "A forfeiture (or an implicit waiver) may withstand constitutional scrutiny where, for instance, a defendant repeatedly threatens harm to his lawyer and/or his lawyer's family and it is apparent that the defendant has the ability to deliver on his threats." *Id.* In *Carruthers*, the Tennessee Supreme Court held that the defendant forfeited his right to counsel when seven attorneys were allowed to withdraw, the defendant repeatedly and unreasonably demanded counsel withdraw and new counsel be appointed, his demands escalated as his scheduled trial neared, he made outrageous allegations and threats against counsel, and he "sabotaged his relationship with each successive attorney with the obvious goal or delaying and disrupting the orderly trial of the case." 35 S.W.3d at 549-50.

The issue of "[w]hether a defendant engages in some form of conduct that justifies a ruling of forfeiture may generally be determined only after an evidentiary hearing at which the defendant is present and permitted to testify." *Holmes*, 302 S.W.3d at 838-39 (citing *Means*, 907 N.E.2d at 662; *King v. Superior Court*, 132 Cal. Rptr. 2d 585, 598-99 (Cal. App. 2003)). An exception to the requirement of an evidentiary hearing occurs when the defendant engages in misconduct in open court. *Id.* at n. 6 (citing *United States v. Leggett*, 162 F.3d 237, 250 (3rd Cir. 1998)). The State has the burden of establishing that the defendant committed acts justifying a forfeiture of the right to counsel. *Id.* at 839 (citing *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). Factors that the trial court should

consider include: "(1) whether the defendant has had more than one appointed counsel; (2) the stage of the proceedings, with forfeiture 'rarely … applied to deny a defendant representation during trial'; (3) violence or threats of violence against appointed counsel; and (4) measures short of forfeiture have been or will be unavailing." *Id.* (quoting *Means*, 907 N.E.2d at 659-61).

In finding that the Defendant forfeited his right to counsel, the trial court emphasized the threats that Mr. Morris received. These threats did not occur in open court, and the Defendant denied making the threats or having any knowledge about the threats. Therefore, an evidentiary hearing was required to determine whether the threats were attributable to the Defendant and if so, whether the Defendant's conduct throughout the proceedings constituted "extremely serious misconduct" so as to justify a forfeiture.

In recognizing the requirement of an evidentiary hearing during which the defendant is present and is allowed to testify, the Tennessee Supreme Court in *Holmes* cited to *King v. Superior Court* and *Commonwealth v. Means*, which set forth protections afforded to a defendant during such a hearing in accordance with the defendant's procedural due process rights. *See id.* at 838-39 (citing *Means*, 907 N.E.2d at 662; *King*, 132 Cal. Rptr. 2d at 598-99). While not specifically referring to due process, our supreme court in *Holmes* recognized that a defendant has similar protections during a forfeiture hearing and set forth a procedure to be followed when a defendant is alleged to have physically attacked his counsel. *Holmes*, 302 S.W.3d at 848. We conclude that this procedural equally applies when counsel receives death threats that are alleged to have been orchestrated by the defendant. The trial court should permit counsel to withdraw if requested. *Id.* Unless the conduct occurred in full view of the trial court, the court should "promptly" conduct an evidentiary hearing, during which the defendant is present and permitted to testify. *Id.* The trial court should make findings of fact based upon the evidence presented and should determine "whether the defendant engaged in 'extremely serious misconduct' sufficient to justify the extraordinary sanction of an immediate forfeiture (or implicit waiver) of counsel." *Id.* The trial court should consider the following factors:

> (a) the stage of the proceedings; (b) whether the lawyer attacked is initial counsel or is a successor to other lawyers allowed to withdraw due to problems with the defendant; (c) whether the defendant had previously been warned about the potential loss of counsel as a result of misbehavior; (d) whether the defendant engaged in misconduct deliberately and with the aim of disrupting, delaying, or otherwise manipulating the proceedings; (e) the degree of violence involved and the seriousness of the injury inflicted; and (f) whether measures short of forfeiture will be adequate to protect counsel.

*Id.* If the trial court determines that the defendant did not commit "extremely serious misconduct" justifying forfeiture of the right to counsel, the trial court should appoint new counsel, advise the defendant of the potential consequences of future misconduct and the risks of self-representation, and order measures necessary to protect new counsel for any future misconduct by the defendant. *Id.*

The Defendant challenges the State's authority to raise the issue of forfeiture and to pursue the forfeiture of the Defendant's right to counsel in the trial court. As our supreme court has recognized, the State has the burden of proving that a defendant committed acts justifying a forfeiture of the right to counsel. *Id.* at 839 (citing *Brewer*, 430 U.S. at 404). Thus, once the State believes that a defendant engaged in "extremely serious misconduct" justifying the forfeiture of counsel, the State may request a hearing and pursue a ruling that the defendant forfeited his right to counsel.

However, we conclude that the trial court erred in denying Mr. Morris's motion to withdraw, requiring Mr. Morris to represent the Defendant during the forfeiture hearing, and in allowing the State to call Mr. Morris to testify as a witness against the Defendant at the hearing while he was also ostensibly representing the Defendant. A conflict of interest "includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. Culbreath*, 30 S.W.3d 309, 312 (Tenn. 2000) (quoting Tenn. R. Sup. Ct. 8, EC 5-1). Mr. Morris received a detailed message threatening his life if he continued representing the Defendant. The caller stated that he had been watching Mr. Morris's home, offered details about Mr. Morris's life, and threatened to either kill Mr. Morris or have him killed if he continued representing the Defendant. Mr. Morris took the threats seriously, called the police, and had officers watching his home. Although the trial court in January denied Mr. Morris's motion to withdraw because an investigation had not yet revealed the Defendant's involvement in the threats, Mr. Morris believed the Defendant was involved, and it was clear that Mr. Morris was unable to exercise his independent professional judgment free of his compromising interests.

Furthermore, once the State sought forfeiture of the Defendant's right to counsel based in part on the threats, an evidentiary hearing was required during which Mr. Morris was a necessary witness. Rule 3.7 of the Tennessee Rules of Professional Conduct prohibits an attorney from acting as an advocate at a trial in which the attorney "is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." Tenn. R. Sup. Ct. Rule 8, RPC 3.7(a). None of the exceptions to the general rule prohibiting an attorney from acting as both an advocate and a necessary witness apply in the present case. Accordingly, Mr. Morris had a conflict of interest that prohibited his continued

representation of the Defendant, and the trial court erred in denying Mr. Morris's motion to withdraw.

The Defendant was represented at the forfeiture hearing by counsel who had a clear conflict of interest. The State served a copy of its memorandum filed in the trial court only on Mr. Morris and did not serve a copy on the Defendant. The record reflects that as a result, the Defendant was unaware of the purpose of the hearing and was operating up to the day before trial under the belief that Mr. Morris would be representing him at trial.

During the forfeiture hearing, Mr. Morris did not question either of the Defendant's prior attorneys in an effort to challenge the allegations that the Defendant engaged in "extremely serious misconduct." Although Mr. Morris was still representing the Defendant, the trial court allowed the State to call Mr. Morris as a witness in order to offer testimony that was adverse to the Defendant's interests. The trial court gave the Defendant the opportunity to cross-examine Mr. Morris. By doing so, the trial court treated the Defendant as proceeding pro se without first finding that the Defendant forfeited his right to counsel. Once Mr. Morris's testimony was completed, the trial court resumed treatment of Mr. Morris as representing the Defendant, while also allowing the Defendant to question witnesses and offer argument. The trial court placed Mr. Morris in the position of deciding whether to challenge and cross-examine the officers who were tasked with investigating the threats made on Mr. Morris's life.

Moreover, the evidentiary hearing was not conducted "promptly" as required by *Holmes*, 302 S.W.3d at 848. The record indicates that Mr. Morris informed the trial court of the threats prior to filing a motion to withdraw in December of 2015. However, the trial court waited several months — until the day before trial — to hold an evidentiary hearing to determine, in light of the threats, whether the Defendant forfeited his right to counsel. The record includes no reasonable explanation for the delay. The trial court did not consider the fact that the hearing occurred the day before trial or the significant disadvantage placed upon the Defendant in forcing him to proceed at trial with less than one day's notice when the trial court scheduled the hearing or ruled that the Defendant forfeited his right to counsel. The Defendant was not given the opportunity to subpoena witnesses in order to present a defense and did not learn that his counsel failed to issue any subpoenas until the morning of the trial. When the Defendant informed the trial court that he intended to present an alibi defense, the State complained that no notice of an alibi defense had been filed. The Defendant cannot be faulted for the failure to provide such notice when he only began representing himself on the prior day.

During voir dire, the Defendant informed the prospective jurors that "they" had fired his counsel on the day before trial. When the State requested a curative instruction,

the trial court did not instruct the prospective jurors that such statements were not evidence and should be disregarded, which is a standard instruction given whenever a prosecutor makes an improper statement to a jury. Rather, the trial court improperly instructed the prospective jurors that contrary to the Defendant's claim, his counsel "was not fired yesterday" but "was allowed to withdraw from representation due to what he believed and the Court believed was Mr. Toomes's refusal to cooperate with him in preparing a defense in this case." Judges are prohibited from commenting on the credibility of witnesses or on the evidence in the case. *See* Tenn. Const. art. VI, § 9 ("The judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law."). Accordingly, trial judges must be "very careful not to give the jury an impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Shuttles*, 767 S.W.2d 403, 407 (Tenn. 1989). "'It is natural that jurors should be anxious to know the mind of the court, and follow it. Therefore, a court cannot be too cautious in his inquiries.'" *State v. Eaves*, 959 S.W.2d 601, 605 (Tenn. Crim. App. 1997) (quoting *McDonald v. State*, 14 S.W. 487, 488 (Tenn. 1890)). Through its instruction, not only did the trial court inform the prospective jurors that the Defendant lied to them, but that the Defendant was so uncooperative that he was required to represent himself at trial. The trial court provided the jury with its personal impression of the Defendant and essentially allowed the jury to consider inadmissible character evidence in determining the Defendant's guilt.

Given the calamity of errors that permeated the proceedings, we conclude that the trial court erred in the procedure it employed to find that the Defendant forfeited his right to counsel and in requiring him to proceed pro se at trial. We note that this court has reversed and remanded for a new trial when the trial court failed to follow the proper procedure to establish forfeiture of the right to counsel. *See, e.g. Rashunus Pearsons*, 2018 WL 4026758, at *10; *State v. Charles Phillip Maxwell*, No. M2009-00467-CCA-R3-CD, 2011 WL 915670, at *4 (Tenn. Crim. App. Mar. 16, 2011). Because the proper procedure was not followed to establish a forfeiture of the right to counsel, we reverse the judgments of the trial court and remand for a new trial. Appellate counsel shall continue to represent the Defendant in the trial court. If the Defendant engages in improper behavior in an effort to further delay the proceedings, the trial court shall promptly hold a hearing in accordance with *Holmes* to determine whether the Defendant implicitly waived or forfeited his right to counsel. Even though we have reversed the judgments, we consider the Defendant's remaining claims in the event of further appellate review.

## II. Suppression of the Defendant's Statements

The Defendant asserts that the trial court erred in denying his motion to suppress his statements to law enforcement, which were made after he was indicted and had been

appointed counsel. He maintains that his statements were taken in violation of his Sixth Amendment right to counsel.[2] The State responds that the trial court properly denied the Defendant's motion because he voluntarily waived his rights and agreed to speak to officers. We agree with the State.

## A. Suppression Hearing

Prior to trial, the Defendant filed a pro se motion to suppress his statements to law enforcement in which he maintained that the statements were involuntary, that he did not waive his rights, and that the statements were obtained after the commencement of formal criminal proceedings and after he had requested counsel. Counsel for the Defendant presented the motion during a pretrial suppression hearing.

During the hearing, Special Agent Ferguson testified that she first spoke to the Defendant on January 29, 2013, at the Lauderdale County Criminal Justice Complex, where he was housed following his arrest for a probation violation. The Defendant had not yet been charged with the victim's murder but had been developed as a suspect. Special Agent Ferguson stated that Special Agent Valerie Trout advised the Defendant of his *Miranda* rights and provided him with a document setting forth his rights, which he signed. At some point during the interview, the Defendant requested an attorney, and the agents terminated the interview.

The Defendant was indicted for the victim's murder on February 11, 2013. He was arraigned on February 19th and was appointed counsel. Special Agent Ferguson testified that on March 5th, she received a call from Officer Andrew Whitehead with the Crockett County Sheriff's Department and that he informed her that the Defendant had requested to speak to her. Special Agents Ferguson and Trout went to the Sheriff's Department where they interviewed the Defendant, and an audio recording of the interview was made. Special Agent Ferguson told the Defendant, "Antonio, they sent word to us that you wanted to see me. Is that right?" The Defendant replied, "Yes, ma'am." Special Agent Ferguson advised the Defendant of his constitutional rights and provided him with a form listing those rights. The Defendant signed the form and agreed to speak to the agents. Special Agent Ferguson denied beating the Defendant in an effort to elicit a confession.

During the interview, the Defendant described the vehicle used during the robbery, but Special Agent Ferguson did not have any photographs of the vehicle to show to the

---

[2] In the heading portion of the Defendant's brief, he frames the issue as whether the statements were taken in violation of the Fifth and Sixth Amendment rights. However, his argument is limited to whether his Sixth Amendment rights were violated.

Defendant. Following the interview, Special Agent Ferguson approached the Defendant's counsel and requested another interview with the Defendant in order to show him photographs of the vehicle. The Defendant's counsel agreed, and Special Agent Ferguson interviewed the Defendant on March 12th in the presence of the Defendant's counsel. The interview was recorded, and both the Defendant and his counsel signed the form in which the Defendant agreed to waive his rights and speak to the agent. Special Agent Ferguson denied coercing the Defendant into providing a statement.

Special Agent Ferguson testified that she spoke to the Defendant again at the sheriff's department on April 24th. She stated that the Defendant was advised of his rights and agreed to waive them and speak to her. The Defendant signed a wavier of rights form, and the form also was signed by Special Agent Ferguson, Special Agent Reynolds, and an investigator with the public defender's office. Special Agent Ferguson denied coercing the Defendant into making a statement. She recalled that the Defendant complained about the conditions at the jail and that Special Agent Jeff Jackson, who was present during a portion of the interview, mentioned a transfer to Obion County Jail. The Defendant stated that he was interested in the transfer, and Special Agent Jackson facilitated the transfer to Obion County Jail.

On cross-examination, Special Agent Ferguson testified that during the January 29th interview, the Defendant requested an attorney when it was suggested that the Defendant undergo a polygraph examination. She agreed with defense counsel that the officers from the sheriff's department "kind of hem-hawed around a little bit" before returning the Defendant to his cell. Special Agent Ferguson stated that during the March 5th interview, she was aware that the Defendant had been appointed counsel and knew the identity of his counsel. She explained that she interviewed the Defendant without his attorney because he had requested to speak to her. She said the Defendant "voluntarily signed a waiver without his lawyer present."

Officer Andrew Whitehead with the Crockett County Sheriff's Department testified that corrections officers came to his office and advised him that the Defendant wanted to speak to an officer. Officer Whitehead contacted his supervisor, who instructed him to contact Special Agent Ferguson. On cross-examination, Officer Whitehead testified that he was not aware that the Defendant invoked his right to counsel in January of 2013. Officer Whitehead stated that although he may have known that the Defendant was represented by counsel at the time, the Defendant had requested to speak to an officer.

Chief Deputy Eric Uselton of the Crockett County Sheriff's Department testified that the Defendant complained of mistreatment while housed at the jail and that the complaints were investigated and determined to be unfounded. TBI Special Agent Jeff

Jackson testified that he was present during one of the interviews in which the Defendant complained of mistreatment at the jail and requested a transfer. Although Special Agent Jackson saw no evidence of mistreatment, he helped facilitate the Defendant's transfer to Obion County Jail. According to the inmate medical form from the Obion County Jail following the Defendant transfer on May 15, 2013, the Defendant did not complain of being beaten or having any injuries.

At the conclusion of the hearing, the trial court denied the motion, finding that the Defendant was advised of his right to counsel prior to speaking to the law enforcement officers.

## B. Sixth Amendment Right to Counsel

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions regarding the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. The State, as the prevailing party, is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law that is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the evidence presented at trial as well as the evidence presented at the suppression hearing. *See State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012); *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Sixth Amendment of the United States Constitution ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. In Tennessee, the Sixth Amendment right to counsel attaches when judicial proceedings are initiated. *State v. Frasier*, 914 S.W.2d 467, 469 (Tenn. 1996) (citing *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980)). Initiation is marked by formal charge, which includes indictment when the charge is initiated by a grand jury. *Id.* "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citing *United States v. Wade*, 388 U.S. 218, 227-28 (1967); *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). Interrogation by the State is considered a "critical" stage of the criminal proceedings. *Id.* (citing *Massiah v. United States*, 377 U.S. 201, 204-05 (1964); *United States v. Henry*, 447 U.S. 264, 274 (1980)).

The record reflects that the Defendant previously requested an attorney during an interview with law enforcement officers before he was charged with the victim's death, that he was then indicted on the charges, and that he was appointed counsel to represent him. Thus, his Sixth Amendment right to counsel had attached when he was questioned in March and April of 2013. However, Special Agent Ferguson testified that she interviewed the Defendant on March 5th after an officer from the jail contacted her and stated that the Defendant wanted to speak to her. Although the Defendant contends that the State failed to present any officer at the suppression hearing to testify that he or she spoke to the Defendant and that the Defendant requested an interview, the recording and transcript of the interview reflects that the Defendant confirmed to Special Agent Ferguson that he had requested to speak to her.

Our supreme court has recognized that the United States Supreme Court, for the purposes of the Sixth Amendment, "has clearly sanctioned the admissibility [of] a statement given after the appointment of counsel and even after defendant has 'expressed his desire to deal with police only through counsel,' where defendant initiates further communication, electing 'to face the state's officers and go it alone,' and knowingly and intelligently waives his Sixth Amendment right to counsel." *State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) (quoting *Patterson v. Illinois*, 487 U.S. 285 (1988); *Edwards v. Arizona*, 451 U.S. 477 (1981)); *see State v. March*, 395 S.W.3d 738, 771 (Tenn. Crim. App. 2011) (reviewing United States Supreme Court opinions and concluding that the Court has not concluded that a defendant "may not initiate post-indictment conversations with police officers concerning his or her case, and voluntarily, knowingly, and intelligently waive his or her Sixth Amendment right to counsel"). The United States Supreme Court has recognized that "[o]ur precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo*, 556 U.S. at 786 (citing *Patterson*, 487 U.S. at 292 n.4; *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Johnson*, 304 U.S. at 464). "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* (citing *Michigan v. Harvey*, 494 U.S. 344, 352-53 (1990)).

When Special Agent Ferguson spoke to the Defendant on three occasions following his indictment and appointment of counsel, the Defendant was advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966). The advice of rights form reflected that the Defendant was advised that he had the right to remain silent, that his statement may be used against him, that he had the right to the assistance of an attorney, and that he would be appointed an attorney if he could not afford one. *See Miranda*, 384 U.S. at 479. On each occasion, the Defendant waived those rights and agreed to speak to Special Agent Ferguson. The Defendant asserts that his waiver of these rights grounded in the Fifth Amendment were insufficient to establish the waiver of

his Sixth Amendment right to counsel. The United States Supreme Court, however, has stated that "when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment." *Montejo*, 556 U.S. at 786 (emphasis in original). "[D]octrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." *Id.* at 795.

The record reflects that during the interviews with law enforcement on March 5th and in April of 2013 following the Defendant's indictment, he was advised of his right to counsel and that he knowingly, voluntarily, and intelligently waived his right to counsel and agreed to speak to the officers. Furthermore, the Defendant was actually represented by counsel during the March 12th interview. Accordingly, the trial court properly denied the Defendant's motion to suppress his statements.

### III. Comments by the Prosecutor

The Defendant contends that the prosecutors made improper comments during both voir dire and closing arguments. The Defendant acknowledges that he failed to object at trial, which generally results in waiver of the issues on appeal. *See* Tenn. R. App. P. 36(a); *State v. Fusco*, 404 S.W.3d 504, 519 (Tenn. Crim. App. 2012). However, he requests review under the plain error doctrine. In response, the State does not address whether the statements were improper but argues that any error did not affect a substantial right as to warrant relief under the plain error doctrine.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors

cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id*. at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

## A. Voir Dire

"The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial." *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994). Parties are permitted to ask questions of prospective jurors "for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R. Crim. P. 24(b)(1). However, "it is improper to ask prospective jurors hypothetical questions that seek to commit the jurors to a specific course of action." *State v. Devaron Taylor*, No. W2009-01252-CCA-R3-CD, 2011 WL 4027147, at *5 (Tenn. Crim. App. Sept. 12, 2011) (citing *Solomon v. State*, 489 S.W.2d 547, 550 (Tenn. Crim. App. 1972)); *see* W. Mark Ward, *Tennessee Criminal Trial Practice* § 20:5, 585-86 (2014-2015 ed.) ("It is improper for either party to extract a pledge from the prospective jurors.").

The Defendant contends that the prosecutor improperly questioned the prospective jurors about their understanding and acceptance of the felony murder rule when he said:

> So what I'm understanding from everybody … is that if the State proves beyond a reasonable doubt that Mr. Toomes, either alone or with others, went to the house of the McKnights on October the 18th of 2012 to commit aggravated burglary and Matthew McKnight was killed by him or one of his accomplices and died during that showing, everyone agrees that you should find him guilty of felony murder and especially aggravated burglary? Is that what I'm understanding from you?

The Defendant also challenges the following statement by the prosecutor has an improper hypothetical question that tended to exact a pledge from the jurors:

> Some people go in a house, commit an aggravated burglary, homeowner comes home, somebody's shot and killed, not intentionally in this case. They didn't intend to kill him. They shot him in the leg so they wouldn't kill him, but what's in your leg? One of the major arteries to the body. Mr. McKnight bled to death there in his home. They didn't intend to kill him. Are they guilty of felony murder under those facts?

Based upon the context in which the hypothetical was made, we cannot conclude that the prosecutor, in posing its hypothetical to the jury, was asking for a commitment from the prospective jurors.  The record reflects that the prosecutor did not give the prospective jurors an opportunity to answer his question, "Are they guilty of felony murder under those facts?"  Rather, the prosecutor continued by explaining to the prospective jurors the charges of especially aggravated robbery and felony murder in an effort to determine whether the prospective jurors could follow the law.  We cannot conclude that the prosecutor's statements violated a clear and unequivocal rule of law as to constitute plain error.  The trial court also properly instructed the jury regarding the elements of each charge and the State's burden to prove those elements beyond a reasonable doubt.  Accordingly, we cannot conclude that any of the prosecutor's statements, if improper, adversely affected the Defendant's substantial rights.  Because the Defendant has failed to establish that the statements rose to the level of plain error, he is not entitled to relief in regard to this issue.

## B.  Closing Arguments

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "'the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.'" *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)).  Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'"  *Id*. (quoting *Banks*, 271 S.W.3d at 130-31).  Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'"  *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131).  Accordingly, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted).  "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted).  Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument:  (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

The Defendant challenges the prosecutor's statement during closing argument that the Defendant told the jury during voir dire that he was going to appeal because he "knows what the evidence is against him and he knows what your decision should be and is going to be." The Defendant also challenges the prosecutor's statement that the Defendant "also told you, 'I've always pled guilty when I'm guilty, but I'm not guilty now so I'm not pleading guilty.' Well, the evidence shows otherwise. Besides that, he's never had a crime this serious. He's just going to take his chances with a trial and appeal you if he has to." "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." *Goltz*, 111 S.W.3d at 8. As a result, a prosecutor, typically, should avoid informing a jury of the defendant's right to appeal as an improper prediction of the consequences of the jury's verdict and as a matter that falls outside the proof. However, the Defendant previously informed the jury that he would appeal if the jury convicted him of the charges, and we cannot conclude that the prosecutor's statements referencing the Defendant's prior statements to the jury constituted a breach of a clear and unequivocal rule of law as to rise to the level of plain error. *See Smith*, 24 S.W.3d at 282.

The Defendant next challenges the prosecutor's statement during rebuttal closing arguments that the gun used to shoot the victim was sold "for pennies on a dollar on the street to somebody. We don't know who, but we don't have to prove to you who he sold the gun to." A prosecutor should not intentionally misstate the evidence or refer to facts outside the record unless the facts are matters of common knowledge. *Goltz*, 111 S.W.3d at 6. There was no evidence presented at trial establishing how those from whom the

murder weapon was recovered came to possess the gun. Therefore, the prosecutor's statement was improper and constituted a breach of a clear and unequivocal rule of law. *See Smith*, 24 S.W.3d at 282.

Finally, the Defendant challenges the prosecutor's statement at the beginning of closing arguments as an expression of the prosecutor's personal belief that the case was so strong that he would not have made a closing argument but for the seriousness of the charges. A prosecutor should not assert his or her personal opinion as to the credibility of a witness or as to a defendant's guilt or innocence. *Goltz*, 111 S.W.3d at 6. The prosecutor, however, "may argue based upon an analysis of the evidence and the conclusion supported by the evidence." *State v. Damarkus Lowe*, No. E2017-00435-CCA-R3-CD, 2018 WL 3323757, at *25 (Tenn. Crim. App. July 6, 2018) (citing Tenn. S. Ct. R. 8, RPC 3.4(e)(3)), *perm. app. denied* (Tenn. Nov. 15, 2018). Whether the prosecutor's statements qualify as misconduct often is dependent upon the specific language used. *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007). "[A]rgument predicated by the words 'I think' or 'I submit' does not necessarily indicate an expression of personal opinion." *Id.* (citing *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)).

The prosecutor informed the jury:

> [T]he Judge says we have a right to make a closing statement. That means we don't have to and normally if the case was a little bit less serious with this magnitude of proof that we have here I probably wouldn't even talk to you. This could have been one of those cases where we just would waive our closing argument. It's that strong, I believe. Overwhelming evidence against the Defendant.

We agree with the Defendant that when the prosecutor explained the basis of his decision regarding whether to proceed with a closing argument, the prosecutor also improperly expressed a personal opinion regarding the Defendant's guilt.

Nevertheless, while we have concluded that the prosecutor made multiple improper comments during his closing and rebuttal arguments, we cannot conclude that the comments were so inflammatory or improper that they affected the outcome of the trial to the Defendant's detriment. *See Banks*, 271 S.W.3d at 131. In light of the evidence presented at trial, which included a detailed confession by the Defendant, we hold that the prosecutor's improper comments did not adversely affect a substantial right of the Defendant. *See Smith*, 24 S.W.3d at 282. Thus, the Defendant has failed to establish plain error.

**CONCLUSION**

We conclude that the trial court erred in finding that the Defendant forfeited his constitutional right to counsel at trial.  Accordingly, we reverse the judgments of the trial court and remand for a new trial.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE